## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

THE CHILDREN'S HOSPITAL
CORPORATION DOING BUSINESS AS
BOSTON CHILDREN'S HOSPITAL;
BOSTON CHILDREN'S HOSPITAL
AMBULANCE; BOSTON CHILDREN'S
HOSPITAL END-STAGE RENAL DISEASE
FACILITY (ESRD) BILLING; BOSTON
CHILDREN'S HEALTH SOLUTIONS RX,
LLC; CHMC ANESTHESIA FOUNDATION
INC; CHMC CARDIOVASCULAR
SURGICAL FOUNDATION INC; BOSTON
CHILDREN'S HEART FOUNDATION INC;
BOSTON CHILDREN'S HOSPITAL
DENTAL GROUP; CHMC SURGICAL
GYNECOLOGY GROUP; CHILDREN'S
HOSPITAL PEDIATRIC ASSOCIATES INC;
CH NEUROLOGY FOUNDATION INC;
BOSTON PEDIATRIC NEUROSURGICAL
FOUNDATION INC; CHILDREN'S
HOSPITAL OPHTHALMOLOGY
FOUNDATION INC; CHILDREN'S
ORTHOPAEDIC SURGERY FOUNDATION
INC; CHMC OTOLARYNGOLOGIC
FOUNDATION INC; CHILDREN'S
HOSPITAL PATHOLOGY FOUNDATION
INC; BOSTON PLASTIC & ORAL
SURGERY FOUNDATION INC;
RICHMOND PSYCHIATRY GROUP
PRACTICE; CHILDREN'S HOSPITAL
RADIOLOGY FOUNDATION INC;
CHILDREN'S SPORTS MEDICINE
FOUNDATION INC; CHMC SURGICAL
FOUNDATION INC; CHILDREN'S
UROLOGICAL FOUNDATION INC;
FRANCISCAN HOSPITAL FOR
CHILDREN, INC.

　　　　　Plaintiffs,

　　v.

BLUE CROSS BLUE SHIELD
ASSOCIATION; BLUE CROSS AND BLUE

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

SHIELD OF MASSACHUSETTS, INC.;
BLUE CROSS AND BLUE SHIELD OF
MASSACHUSETTS HMO BLUE, INC.;
ELEVANCE HEALTH, INC.; BLUE CROSS
OF CALIFORNIA D/B/A ANTHEM BLUE
CROSS; ANTHEM BLUE CROSS LIFE
AND HEALTH INSURANCE COMPANY;
BLUE CROSS OF NORTHERN
CALIFORNIA; BLUE CROSS OF
SOUTHERN CALIFORNIA; ROCKY
MOUNTAIN HOSPITAL AND MEDICAL
SERVICE, INC. D/B/A ANTHEM BLUE
CROSS AND BLUE SHIELD OF
COLORADO; ANTHEM HEALTH PLANS,
INC. D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD; BLUE CROSS AND BLUE
SHIELD HEALTHCARE PLAN OF
GEORGIA, INC.; ANTHEM INSURANCE
COMPANIES, INC. D/B/A BLUE CROSS
AND BLUE SHIELD OF INDIANA AND
ANTHEM BLUE CROSS AND BLUE
SHIELD; ANTHEM HEALTH PLANS OF
KENTUCKY, INC. D/B/A ANTHEM BLUE
CROSS AND BLUE SHIELD; ANTHEM
HEALTH PLANS OF MAINE, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE
SHIELD AND D/B/A ASSOCIATED
HOSPITAL SERVICE; HMO MISSOURI,
INC. D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD OF MISSOURI; HEALTH
ALLIANCE LIFE INSURANCE COMPANY
D/B/A ANTHEM BLUE CROSS AND BLUE
SHIELD; ROCKY MOUNTAIN HOSPITAL
AND MEDICAL SERVICE, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE
SHIELD NEVADA; ANTHEM HEALTH
PLANS OF NEW HAMPSHIRE, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE
SHIELD; ANTHEM HEALTHCHOICE
ASSURANCE, INC.; ANTHEM
HEALTHCHOICE HMO, INC.;
COMMUNITY INSURANCE COMPANY
D/B/A ANTHEM BLUE CROSS AND BLUE
SHIELD OF OHIO; ANTHEM HEALTH
PLANS OF VIRGINIA, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE

SHIELD; BLUE CROSS BLUE SHIELD OF
WISCONSIN D/B/A ANTHEM BLUE
CROSS AND BLUE SHIELD; AWARE
INTEGRATED, INC.; BCBSM, INC. D/B/A
BLUE CROSS AND BLUE SHIELD OF
MINNESOTA; BLUE CROSS AND BLUE
SHIELD OF ALABAMA; HAWAII
MEDICAL SERVICE ASSOCIATION D/B/A
BLUE CROSS AND BLUE SHIELD OF
HAWAII; BLUE CROSS AND BLUE
SHIELD OF KANSAS, INC.; BLUE CROSS
AND BLUE SHIELD OF KANSAS CITY;
LOUISIANA HEALTH SERVICE &
INDEMNITY COMPANY D/B/A BLUE
CROSS AND BLUE SHIELD OF
LOUISIANA; BLUE CROSS BLUE SHIELD
OF MICHIGAN MUTUAL INSURANCE
COMPANY; BLUE CROSS & BLUE
SHIELD OF MISSISSIPPI, A MUTUAL
INSURANCE COMPANY; BLUE CROSS
AND BLUE SHIELD OF NORTH
CAROLINA, INC.; BLUE CROSS BLUE
SHIELD OF RHODE ISLAND;
BLUECROSS BLUESHIELD OF SOUTH
CAROLINA; BLUECROSS BLUESHIELD
OF TENNESSEE, INC.; BLUE CROSS AND
BLUE SHIELD OF VERMONT; BLUE
CROSS BLUE SHIELD OF WYOMING;
CALIFORNIA PHYSICIANS' SERVICE,
INC. D/B/A BLUE SHIELD OF
CALIFORNIA; CAMBIA HEALTH
SOLUTIONS, INC.; REGENCE
BLUESHIELD OF IDAHO, INC.; REGENCE
BLUECROSS BLUESHIELD OF OREGON;
REGENCE BLUECROSS BLUESHIELD OF
UTAH; REGENCE BLUESHIELD;
CAPITAL BLUE CROSS; CAREFIRST, INC.
D/B/A CAREFIRST BLUECROSS
BLUESHIELD; CAREFIRST
BLUECHOICE, INC. D/B/A CAREFIRST
BLUECROSS BLUESHIELD; GROUP
HOSPITALIZATION AND MEDICAL
SERVICES, INC. D/B/A CAREFIRST
BLUECROSS BLUESHIELD; CAREFIRST
OF MARYLAND, INC. D/B/A CAREFIRST
BLUECROSS BLUESHIELD; LIFETIME

HEALTHCARE, INC.; EXCELLUS
HEALTH PLAN, INC. D/B/A EXCELLUS
BLUECROSS BLUESHIELD; GEMSTONE
HOLDINGS, INC.; BLUE CROSS OF
IDAHO HEALTH SERVICE, INC. D/B/A
BLUE CROSS OF IDAHO; GOODLIFE
PARTNERS, INC.; BLUE CROSS AND
BLUE SHIELD OF NEBRASKA;
GUIDEWELL MUTUAL HOLDING
CORPORATION; BLUE CROSS AND
BLUE SHIELD OF FLORIDA, INC.;
TRIPLE-S MANAGEMENT
CORPORATION; TRIPLE-S SALUD, INC.;
HEALTH CARE SERVICE
CORPORATION; BLUE CROSS AND
BLUE SHIELD OF ILLINOIS; BLUE
CROSS AND BLUE SHIELD OF
MONTANA; CARING FOR MONTANANS,
INC.; BLUE CROSS AND BLUE SHIELD
OF NEW MEXICO; BLUE CROSS AND
BLUE SHIELD OF OKLAHOMA; BLUE
CROSS AND BLUE SHIELD OF TEXAS;
HEALTHYDAKOTA MUTUAL
HOLDINGS; BLUE CROSS BLUE SHIELD
OF NORTH DAKOTA; HIGHMARK
HEALTH; HIGHMARK BCBSD INC. D/B/A
HIGHMARK BLUE CROSS AND BLUE
SHIELD DELAWARE; HIGHMARK
WESTERN AND NORTHEASTERN NEW
YORK INC. D/B/A HIGHMARK BLUE
CROSS BLUE SHIELD OF WESTERN NEW
YORK AND D/B/A HIGHMARK BLUE
SHIELD OF NORTHEASTERN NEW
YORK; HIGHMARK INC.; HIGHMARK
WEST VIRGINIA INC. D/B/A HIGHMARK
BLUE CROSS BLUE SHIELD WEST
VIRGINIA; HORIZON HEALTHCARE
SERVICES, INC. D/B/A HORIZON BLUE
CROSS BLUE SHIELD OF NEW JERSEY;
INDEPENDENCE HEALTH GROUP, INC.;
PREMERA; PREMERA BLUE CROSS
BLUE SHIELD OF ALASKA; PREMERA
BLUE CROSS; PROSANO, INC.; BLUE
CROSS AND BLUE SHIELD OF ARIZONA,
INC.; USABLE MUTUAL INSURANCE
COMPANY D/B/A ARKANSAS BLUE

CROSS AND BLUE SHIELD AND BLUE
ADVANTAGE ADMINISTRATORS OF
ARKANSAS; WELLMARK, INC.;
WELLMARK, INC. D/B/A WELLMARK
BLUE CROSS AND BLUE SHIELD OF
IOWA; AND WELLMARK OF SOUTH
DAKOTA, INC. D/B/A WELLMARK BLUE
CROSS AND BLUE SHIELD OF SOUTH
DAKOTA,

           Defendants.

# TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ..................................................................................1

JURISDICTION AND VENUE .........................................................................3

INTERSTATE COMMERCE ............................................................................5

THE PUTATIVE PROVIDER CLASS ACTION SETTLEMENT ....................5

TOLLING OF THE STATUTE(S) OF LIMITATIONS ...................................6

PARTIES .........................................................................................................6

I.      PLAINTIFFS ......................................................................................6

II.     DEFENDANTS ................................................................................13

        A.      Blue Cross Blue Shield Association Defendant..................13

        B.      BCBS-MA...........................................................................14

        C.      Anthem Defendants ............................................................15

        D.      Aware Defendants ..............................................................25

        E.      BCBS-AL Defendant ..........................................................26

        F.      BCBS-HI Defendant ...........................................................27

        G.      BCBS-KS Defendant ..........................................................27

        H.      BCBS-KC Defendant ..........................................................28

        I.      BCBS-LA Defendant ..........................................................28

        J.      BCBS-MI Defendant ...........................................................29

        K.      BCBS-MS Defendant ..........................................................29

        L.      BCBS-NC Defendant ..........................................................30

        M.      BCBS-RI Defendant ...........................................................30

        N.      BCBS-SC Defendant ...........................................................30

        O.      BCBS-TN Defendant ..........................................................31

        P.      BCBS-VT............................................................................31

        Q.      BCBS-WY ..........................................................................32

        R.      BS-CA Defendant ...............................................................32

        S.      Cambia Defendants .............................................................33

        T.      Capital-PA Defendant .........................................................35

        U.      CareFirst Defendants ..........................................................35

        V.      Excellus Defendants............................................................38

| | | | |
|---|---|---|---|
| W. | Gemstone Defendants | .................................................................... | 38 |
| X. | Goodlife Defendants | ..................................................................... | 39 |
| Y. | GuideWell Defendants | .................................................................. | 40 |
| Z. | HCSC Defendants | ......................................................................... | 42 |
| AA. | HealthyDakota Defendants | ......................................................... | 45 |
| BB. | Highmark Defendants | ................................................................... | 46 |
| CC. | Horizon-NJ Defendant | ................................................................ | 49 |
| DD. | Independence-PA Defendant | ....................................................... | 50 |
| EE. | Premera Defendants | ..................................................................... | 50 |
| FF. | Prosano Defendants | ...................................................................... | 51 |
| GG. | USAble-AR Defendant | ................................................................ | 52 |
| HH. | Wellmark Defendants | ................................................................... | 53 |

FACTUAL ALLEGATIONS ...................................................................................54

III. THE RELATIONSHIP OF THE PARTIES .................................................54

IV. THE BLUES' MARKET ALLOCATION SCHEME ....................................57

    A. License Agreements .........................................................................59

    B. Guidelines and Membership Standards: The Best Efforts Rules ..........66

    C. Side Agreements ..............................................................................69

    D. BlueCard Program ...........................................................................70

V. THE DEFENDANT BLUES' BOYCOTT CONSPIRACY ..........................75

VI. OTHER ANTICOMPETITIVE CONDUCT .................................................76

    A. The National Accounts Program ......................................................76

    B. Blue Health Intelligence ..................................................................78

VII. ENFORCING COMPLIANCE WITH THE BLUES' ANTICOMPETITIVE AGREEMENTS....................................................................................................80

VIII. RULE OF REASON ALLEGATIONS ..........................................................82

    A. Relevant Product Markets ................................................................82

    B. Relevant Geographic Markets ..........................................................87

    C. Defendant Blues' Market Power .......................................................88

    D. Defendant Blues' Market Power in the Relevant Markets .................91

    E. Defendants' Anticompetitive Conduct .............................................93

IX. BCBS-MA HAS  PROFITED FROM THE UNFAIR COMPETITION .........96

X.     THE CHALLENGED CONDUCT HAS CAUSED PLAINTIFFS' ANTITRUST
       INJURIES ..................................................................................................97

XI.    THE CHALLENGED CONDUCT SHOULD BE ENJOINED ....................................100

XII.   PLAINTIFFS' DAMAGES FROM THE CHALLENGED CONDUCT ........................102

CAUSES OF ACTION ........................................................................................................102

       First Cause of Action .................................................................................102

       Second Cause of Action..............................................................................104

       Third Cause of Action................................................................................105

REQUEST FOR RELIEF ...................................................................................................106

JURY DEMAND ...............................................................................................................109

Plaintiff Boston Children's Hospital, BCH Hospital Ambulance, etc. (collectively, "Plaintiffs" or "Boston Children's Hospital"), by their undersigned counsel, allege, with knowledge with respect to their own acts and on information and belief as to other matters, as follows:

## NATURE OF THE CASE

1.     Plaintiffs are all affiliates of the Boston Children's Hospital, which is perhaps the most preeminent institution in the country dedicated to the health, safety and well-being of children.  The practice of medicine is so cutting-edge at Boston Children's Hospital that parents and physicians from all over the world seek out the medical care they can provide to their children/patients.

2.     As set out herein, Boston Children's Hospital has brought this suit against the Defendant Blues because Defendants have been underpaying Boston Children's Hospital and its affiliates for years.  Since July 24, 2008 and continuing to the present (the "Relevant Time Period"),  Defendants have deprived Plaintiffs of a fair and competitive reimbursement rate for their services.  Instead, the Defendants have conspired together to allocate territories in which they can do business, called Exclusive Service Areas ("ESAs"), and to fix prices and otherwise refuse to compete with each other in these territories.  The result is that Defendants routinely reimburse Boston Children's Hospital and its affiliates at rates measurely less than those paid by other national insurers who, unlike Defendants, are not in violation of the U.S. antitrust laws.

3.     Defendants are thirty-three[1] Blue Cross/Blue Shield commercial insurance plans and their association, the Blue Cross Blue Shield Association ("BCBSA").  Through their

---

[1]  The October 2024 agreement in which Defendants settled antitrust claims brought by a putative class of health care providers in the related Multidistrict ("MDL") Litigation in the Northern District Of Alabama reflects thirty-two Primary Licensees.  BCBSA's website continues to list

anticompetitive acts and conduct, Defendants have put Boston Children's Hospital in a double squeeze. First, for patients covered by plans either insured or in Massachusetts and administered by Blue Cross Blue Shield Massachusetts ("BCBS-MA"), BCBS-MA has tremendous leverage given its size to pressure Boston Children's Hospital into accepting lower reimbursement rates than it would if BCBS-MA had other Blue competitors—which does not happen because of the Market Allocation Scheme and Defendants' carving out ESAs as well as other anticompetitive conduct as set out herein. Second, because of the BlueCard program and Defendants' anticompetitive conduct, the Defendant Blues other than BCBS-MA lack any economic incentive to and will not negotiate rates with Boston Children's Hospital that otherwise would be higher than BCBS-MA rates given their much lower volume and leverage compared to BCBS-MA. Therefore, the other Defendant Blues reimburse Plaintiffs at much lower rates than would otherwise be the case but for their anticompetitive conduct and their ability to reimburse at BCBS-MA's lower rate.

4.     Together, Defendants have collectively engaged in an unlawful Market Allocation Scheme by agreeing among themselves not to compete outside their designated ESAs. This scheme is made up of several distinct, but related components: the Blues' Licensing Agreements; the BCBSA "Guidelines and Membership Standards"; the Blues' Side Agreements; and the BlueCard Program. Together, these components result in a rigged market in which each Blue Defendant sticks to its own ESA and does not compete against any of the other Blues, which in a competitive market would be its rivals and result in higher reimbursements to Boston Children's Hospital and its affiliates.

---

thirty-three. Regardless, Plaintiffs have sought to identify all relevant Blue entities offering commercial health insurance plans as Defendants in this Complaint.

5.    Complementing the Defendants' Market Allocation Scheme, the Blues have engaged in several other unlawful acts of anticompetitive misconduct.  These include the "National Accounts Program," which is nothing less than an express agreement not to compete for certain key national accounts, and the "Blue Health Intelligence" system, in which the Blues unlawfully have shared sensitive competitive data with each other to further cement their collective dominance and control over the United States healthcare sector.

6.    At the same time that they have been reimbursing Boston Children's Hospital and its affiliates at low, anticompetitive rates, the Blues have enriched themselves, stockpiling billions of dollars in reserves and paying their senior executives exorbitant salaries, amounting to millions of dollars annually.

7.    Through these anticompetitive acts, Defendants' conduct has caused Plaintiffs to be severely under-reimbursed for treating their patients by literally billions of dollars.  Defendants' conduct has also increased costs for Plaintiffs' patients—the Blues' subscribers—all for Defendants' own financial gain.  This conduct is unlawful under a *per se*, quick look, or rule of reason analysis.

*    *    *

## JURISDICTION AND VENUE

8.    Plaintiffs' federal antitrust claims are brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367.  This Court also has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because such state law claims are related to, and form part of, the same case or controversy.

9.     This Court has personal jurisdiction over Defendants on several grounds.  First, Defendants Blue Cross and Blue Shield of Massachusetts, Inc. and Blue Cross and Blue Shield HMO are located in Massachusetts and have negotiated with and entered into contracts in Massachusetts directly with Plaintiffs, or affiliates or entities owned and/or controlled by Plaintiffs.  Second, all Defendants have significant business in, and contacts with, Massachusetts through the Defendants' national programs including the BlueCard Program, the National Accounts Programs, and the Inter-Plan Medicare Advantage Program, both in terms of the Blues' subscribers who receive health care and other services, goods and facilities, and in terms of subscribers who receive treatment in their ESAs, with all the Defendants dividing revenue resulting from those goods, services, and facilities.  Third, the Defendants operating outside of Massachusetts have caused harm in Massachusetts pursuant to the challenged conduct.  Fourth, all Defendants have conspired amongst themselves to violate the antitrust laws throughout the United States and this state.  Accordingly, this Court has personal jurisdiction over Defendants under:

a.     Section 12 of the Clayton Act, 15 U.S.C. § 22;

b.     The conspiracy theory of jurisdiction because Defendants participated in a conspiracy in which at least one conspirator committed overt acts in this state in furtherance of the challenged conduct; and

c.     The long-arm statute of the Commonwealth of Massachusetts because the Defendants' business activities constitute minimum contacts here, and the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment.

10.     Venue is proper in this District under 15 U.S.C. §§ 15, 22 and 26, because Defendants transact business in this District, and 28 U.S.C. § 1391, because (a) a substantial part

of the events, acts and omissions giving rise to this action occurred in this judicial district, and/or

(b) this is a judicial district in which Defendants are subject to the Court's personal jurisdiction.

## INTERSTATE COMMERCE

11.    The activities of Defendants that are the subject of this Complaint are within the

flow of, and have substantially affected, interstate trade and commerce.

12.    Plaintiffs provide goods, healthcare and other services, and facilities to persons who

reside in Massachusetts.

13.    The Defendants' Inter-Plan Programs, including the BlueCard Program and

National Accounts Program, are involved in interstate commerce and transactions for health care

and other services, goods and facilities.

14.    Plaintiffs and other health care providers have used interstate banking facilities and

have purchased substantial quantities of health care and other services, goods and facilities across

state lines for use in providing health care and other services, goods and facilities to individuals.

## THE PUTATIVE PROVIDER CLASS ACTION SETTLEMENT

15.    On or about July 24, 2012, a putative class of health care providers filed a complaint

against Defendants, which complaint as amended is currently pending in the MDL Litigation,

seeking relief from the same anticompetitive conduct alleged in this Complaint.  Indeed, in 2018

the presiding federal judge in that matter, Judge David Proctor, determined that certain of

Defendants' conduct constituted a *per se* violation of the Sherman Act.  Plaintiffs challenge the

very same conduct, and more, in their Complaint herein.

16.    On or about October 14, 2024, counsel for the putative class and counsel for

defendants in the MDL Litigation filed a notice that they had reached a settlement.

17.     Plaintiffs have filed timely exclusion requests and validly opted out of this provider settlement class in the MDL Litigation.  Plaintiffs "preserve absolutely their right to litigate" by opting out of the settlement class.  *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 385 (1996).  Plaintiffs are not seeking to alter or interfere with the injunctive relief in the provider class settlement in the MDL Litigation.

## TOLLING OF THE STATUTE(S) OF LIMITATIONS

18.     The statute(s) of limitation as to Defendants' continuing antitrust violations alleged in this Complaint were tolled by the pendency of one or more class action complaints, including those cases pending in the MDL Litigation.

19.     In addition, the nature of Defendants' violation of the antitrust laws is a continuing violation in which each reimbursement agreement negotiated with Plaintiffs and each under-reimbursement of a claim paid to Plaintiffs was (i) a new and independent act occurring in furtherance of the challenged conduct, and (ii) inflicted a new and accumulating injury to each Plaintiff in the form of anticompetitive reimbursement rates and unfavorable contract terms for the duration of each new contract and beyond.  Defendants' actions to continually make and enforce new, anticompetitive contractual terms in furtherance of the challenged conduct is an exception to the governing statute(s) of limitations.

## PARTIES

### I.     PLAINTIFFS

20.     **Boston Children's Hospital**.  Plaintiff Boston Children's Hospital, a not-for-profit Massachusetts corporation, is a leading pediatric academic medical center and is the only freestanding pediatric acute care hospital in The Commonwealth of Massachusetts and the largest in New England.  Boston Children's Hospital's mission is to provide the highest quality of pediatric health care, to lead the way in research and discovery, to educate the next generation of

leaders in health care, and to enhance the health and well-being of children and families in the local community.  Established as a hospital for poor urban children in 1869 with only 20 beds, Boston Children's Hospital now operates a 485 licensed-bed acute care hospital and offers a complete range of health care services for children from birth through 21 years of age, with several programs continuing to see adult patients.  Boston Children's Hospital's 275 specialized clinical programs account for more than 750,000 patient visits per year.  Boston Children's Hospital differentiates itself through advanced research and innovation which enables it to provide care for children with the most complex and rare medical conditions.  Boston Children's Hospital is a world leader in pediatric research by providing funding, facilities and an environment for basic science as well as translational research, with a growing emphasis on first-time human trials, and is home to the world's largest pediatric research enterprise.  Boston Children's Hospital serves as the primary pediatric teaching hospital of the Harvard Medical School, at which substantially all members of the Boston Children's Hospital active medical staff hold faculty appointments.  It has 49 Accreditation Council for Graduate Medical Education accredited training programs with 558 interns, residents and clinical fellows.  Another approximately 950 residents rotate through Boston Children's Hospital each year for training.  It is New England's regional referral pediatric center and a safety net hospital for the most critically ill children and those from low-income families. Boston Children's Hospital works with the community to address the most pressing health care needs in surrounding neighborhoods.  Boston Children's Hospital and its related foundations have committed to being resources for children in need of care and provide financial assistance to eligible patients who receive medical services at Boston Children's Hospital locations.

21.    **Boston Children's Hospital Ambulance**.  Plaintiff Boston Children's Hospital Ambulance is a program within Boston Children's Hospital with a unique National Provider

Identifier.  Boston Children's Hospital Ambulance is referred to within Boston Children's Hospital as a "service fund," has a separate tax identifier from Boston Children's Hospital, and has a unique Medicare Provider Transaction Access Number.   Boston Children's Hospital Ambulance coordinates and provides transport services for critically ill and injured children to Boston Children's Hospital.

22.    **Boston Children's Hospital End-Stage Renal Disease Facility Billing**.  Plaintiff Boston Children's Hospital End-Stage Renal Disease Facility Billing is a program within Boston Children's Hospital with a unique Medicare Provider Transaction Access Number.  The End-Stage Renal Disease Program provides comprehensive care, including medical management, dialysis and transplantation, for children with end-stage renal disease.  Its clinical staff includes a number of experts from various subspecialties who work as a team to deliver the most consistent and comprehensive care to each child.

23.    **Boston Children's Health Solutions RX, LLC**.  Plaintiff Boston Children's Health Solutions RX is a Massachusetts limited liability company and an affiliate of Boston Children's Hospital.  It is licensed as a community pharmacy under Massachusetts law and provides specialty pharmacy services to patients suffering from complex chronic conditions, among others.  It provides access to recently approved and newly available drugs and offers expanded patient support services, including assisting patients in obtaining financial assistance, navigating insurance benefits, and managing prescription refills.

24.    **CHMC Anesthesia Foundation Inc**.  Plaintiff CHMC Anesthesia Foundation, Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard

Medical School and employs Anesthesia physician faculty that are active members of the Boston Children's Hospital medical staff.

25.    **CHMC Cardiovascular Surgical Foundation Inc**.  Plaintiff CHMC Cardiovascular Surgical Foundation, Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Cardiovascular Surgery physician faculty that are active members of the Boston Children's Hospital medical staff.

26.    **Boston Children's Hospital Heart Foundation Inc**.  Plaintiff Boston Children's Hospital Heart Foundation, Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Cardiology physician faculty that are active members of the Boston Children's Hospital medical staff.

27.    **Boston Children's Hospital Dental Group**.  Plaintiff Boston Children's Hospital Dental Group is a program within Boston Children's Hospital with a unique National Provider Identifier.  Boston Children's Hospital Dental Group is referred to within Boston Children's Hospital as a "service fund" and has a separate tax identifier from Boston Children's Hospital. Boston Children's Hospital Dental Group is one of the largest pediatric dentistry services providers in New England and treats more than 29,000 patients each year, nearly 60% of whom have at least one special health care need, including autism spectrum disorder, down syndrome, cerebral palsy, heart disease, bleeding disorders, and childhood cancer.

28.    **CHMC Surgical Gynecology Group**.  CHMC Surgical Gynecology Group is a program within CHMC Surgical Foundation Inc. with a unique National Provider Identifier. CHMC Surgical Gynecology Group has a separate tax identifier from each of Boston Children's

Hospital and CHMC Surgical Foundation, Inc., and has a unique Medicare Provider Transaction Access Number.

29.    **Children's Hospital Pediatric Associates Inc**.  Plaintiff Children's Hospital Pediatric Associates, Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Pediatrics physician faculty that are active members of the Boston Children's Hospital medical staff.

30.    **CH Neurology Foundation Inc**.  Plaintiff CH Neurology Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Neurology physician faculty that are active members of the Boston Children's Hospital medical staff.

31.    **Boston Pediatric Neurosurgical Foundation Inc**.  Plaintiff Boston Pediatric Neurosurgical Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Neurosurgery physician faculty that are active members of the Boston Children's Hospital medical staff.

32.    **Children's Hospital Ophthalmology Foundation Inc**. Plaintiff Children's Hospital Ophthalmology Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Ophthalmology physician faculty that are active members of the Boston Children's Hospital medical staff.

33.    **Children's Orthopaedic Surgery Foundation Inc**. Plaintiff Children's Orthopaedic Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Orthopaedic Surgery physician faculty that are active members of the Boston Children's Hospital medical staff.

34.    **Boston Plastic & Oral Surgery Foundation Inc**. Plaintiff Boston Plastic & Oral Surgery Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Plastic and Oral Surgery physician faculty that are active members of the Boston Children's Hospital medical staff.

35.    **Richmond Psychiatry Group Practice**. Plaintiff Richmond Psychiatry Group is a program within Boston Children's Hospital with a unique National Provider Identifier. Richmond Psychiatry Group is referred to within Boston Children's Hospital as a "service fund," has a separate tax identifier from Boston Children's Hospital, and has a unique Medicare Provider Transaction Access Number. It provides excellence and innovation in clinical care, education, research, and advocacy for the mental health of children and families.

36.    **CHMC Otolaryngologic Foundation Inc. Foundation Inc**. Plaintiff CHMC Otolaryngologic Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Otolaryngology physician faculty that are active members of the Boston Children's Hospital medical staff.

37.    **Children's Hospital Pathology Foundation Inc**. Plaintiff Children's Hospital Pathology Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in

11

support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Pathology physician faculty that are active members of the Boston Children's Hospital medical staff.

38.    **Children's Hospital Radiology Foundation Inc**.  Plaintiff Children's Hospital Radiology Foundation, Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Radiology physician faculty that are active members of the Boston Children's Hospital medical staff.

39.    **Children's Sports Medicine Foundation Inc**.  Plaintiff Children's Sports Medicine Foundation, Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Sports Medicine physician faculty that are active members of the Boston Children's Hospital medical staff.

40.    **CHMC Surgical Foundation Inc**.  Plaintiff CHMC Surgical Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Surgery physician faculty that are active members of the Boston Children's Hospital medical staff.

41.    **Children's Urological Foundation Inc**.  Plaintiff Children's Urological Foundation Inc., a not-for-profit Massachusetts corporation, operates exclusively in support of the clinical, educational, research and community missions of Boston Children's Hospital and Harvard Medical School and employs Urology physician faculty that are active members of the Boston Children's Hospital medical staff.

42.    **Franciscan Hospital for Children, Inc.**   Plaintiff Franciscan Hospital for Children, Inc. ("Franciscan Children's) is a not-for-profit Massachusetts corporation operating in Boston, Massachusetts. It is a pediatric service provider with specialized capacity to care for (i) the most medically complex children, including newborn babies on ventilators, (ii) children with behavioral health conditions requiring inpatient services, short-term residential, school-based, ambulatory and/or community-based services, (iii) children who need specialized dental services, including dental surgeries under general anesthesia, and (iv) children with specialized educational needs due to their physical and/or cognitive condition.  Franciscan Children's is the only pediatric chronic disease and rehabilitation hospital in Massachusetts.  Its patients and students arrive from providers and school systems across New England.  Franciscan Hospital for Children, Inc. is affiliated with Boston Children's Hospital and is a subsidiary of Children's Medical Center Corporation.

## II.    DEFENDANTS

### A.    Blue Cross Blue Shield Association Defendant

43.    **BCBSA.**  Defendant BCBSA is a not-for-profit corporation organized in Illinois and headquartered in Chicago, Illinois.  It is owned and controlled by the Blues.  BCBSA was created by the Blues and purports to operate as a trademark and trade name licensor.  Health insurance companies operating Blue Plans provide health insurance coverage for over 115 million members.  BCBSA itself does not provide health insurance and does not contract with health care providers (including Plaintiffs); rather, it operates to create anticompetitive agreements among its members.  BCBSA is governed by a board of directors, two-thirds of which must be composed of either Blue chief executive officers or Blue board members.  BCBSA's funding is provided by the Blues.  Through its own actions and through its subsidiaries or affiliated companies, BCBSA has agreed to and participates in the challenged conduct.

44.     The principal headquarters for BCBSA is located at 225 North Michigan Avenue, Chicago, IL 60601.

**B.     BCBS-MA**

45.     **BCBS-MA**.  Defendant Blue Cross and Blue Shield of Massachusetts, Inc. is a Massachusetts non-profit with its headquarters located in Massachusetts.  Blue Cross and Blue Shield of Massachusetts, Inc., itself or through subsidiaries or affiliated companies, provides health insurance to subscribers throughout Massachusetts, and is the largest health insurer in the Commonwealth.  Blue Cross and Blue Shield of Massachusetts, Inc. and its subsidiaries and affiliated companies, exercise market dominance throughout the Commonwealth of Massachusetts, which constitutes its Exclusive Service Area.  Through its own actions and through its subsidiaries or affiliated companies, Blue Cross and Blue Shield of Massachusetts and its subsidiaries and its affiliated companies have agreed to and in fact have participated in the challenged conduct.  BCBS-MA is one of the largest health insurers in the country by total medical enrollment, with approximately 3 million subscribers in Massachusetts.

46.     **Blue Cross and Blue Shield of Massachusetts HMO Blue**.  Defendant Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. is a Massachusetts company with its headquarters located in Massachusetts.  Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc., itself or through subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Massachusetts.  Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. and its subsidiaries and affiliated companies, and Blue Cross Blue Shield of Massachusetts, Inc. are collectively referred to in this Complaint as "BCBS-MA."  BCBS-MA exercises market dominance as a Blue in the Commonwealth of Massachusetts or within areas of Massachusetts.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-MA has agreed to and in fact has participated in the challenged conduct.

47.     The principal headquarters for BCBS-MA is located at 101 Huntington Avenue, Suite 1300, Boston, MA 02199-7611.

**C.     Anthem Defendants**

48.     **Anthem**.  Defendant Elevance Health, Inc. (formerly Anthem, Inc., which itself was formerly Wellpoint, Inc.) is an Indiana corporation with its headquarters in Indiana.  Elevance Health, Inc. and its subsidiaries including Anthem Insurance Companies, Inc., Anthem Holding Company, LLC, Anthem Holding Corp., Anthem Southeast, Inc., and WellPoint Holding Corp., and their subsidiaries and affiliated companies are collectively referred to as "Anthem" in this Complaint.  Anthem is one of the largest health benefits companies in the nation, is the largest BCBSA Primary Licensee, and is a publicly-traded, for-profit company.  Anthem is also the largest or one of the largest health insurers, as measured by number of subscribers, within its exclusive, protected Service Areas.  Anthem, either directly or by and through its subsidiaries and affiliated companies, owns and/or operates Blues in several states, including in California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.  Anthem exercises market dominance as a Blue in its states or areas within those states of operation.  Through its own actions and those of its subsidiaries, Anthem has agreed to and participates in the challenged conduct.

49.     The principal headquarters for Elevance Health, Inc. is located at 20 Virginia Avenue, Indianapolis, IN 46204.

50.     **Anthem-CA**.  Defendant Blue Cross of California d/b/a/ Anthem Blue Cross is a California company with its headquarters located in California.  It is a subsidiary of Defendant Elevance Health, Inc. Blue Cross of California d/b/a/ Anthem Blue Cross, itself or through its subsidiaries or affiliated companies, provides health insurance to various health care plan subscribers in California.  Blue Cross of California d/b/a/ Anthem Blue Cross and its subsidiaries,

affiliated companies, and companies under the common ownership of Defendant Elevance Health, Inc., including Anthem Blue Cross Life and Health Insurance Company, Blue Cross of Northern California, and Blue Cross of Southern California, are collectively referred to herein as "Anthem Blue Cross of California" or "Anthem-CA." The principal headquarters for Anthem-CA is located at One Wellpoint Way, Thousand Oaks, CA 91362.

51.    Anthem-CA exercises market dominance as a Blue in California or within areas of California. Through its own actions and through the actions of its subsidiaries or affiliated companies, Anthem-CA has agreed to and participates in the challenged conduct.

52.    **Anthem Blue Cross Life and Health Insurance Company**. Defendant Anthem Blue Cross Life and Health Insurance Company is a California company with its headquarters located at One Wellpoint Way, Thousand Oaks, CA 91362. It is a subsidiary of Defendant Elevance Health, Inc. Anthem Blue Cross Life and Health Insurance Company, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in California. Anthem Blue Cross Life and Health Insurance Company and its subsidiaries, affiliated companies, and companies under the common ownership of Defendant Elevance Health, Inc., including Blue Cross of California d/b/a/ Anthem Blue Cross, Blue Cross of Northern California, and Blue Cross of Southern California, are collectively referred to as "Anthem Blue Cross of California" or "Anthem-CA." Anthem-CA exercises market dominance as a Blue in California or within areas of California. Through its own actions and through its subsidiaries or affiliated companies, Anthem-CA has agreed to and participates in the challenged conduct.

53.    **Blue Cross of Northern California**. Defendant Blue Cross of Northern California is a California company with its headquarters located at One Wellpoint Way, Thousand Oaks, CA

91362.  It is a subsidiary of Defendant Elevance Health, Inc. Blue Cross of Northern California, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in California.  Blue Cross of Northern California and its subsidiaries, affiliated companies, and companies under the common ownership of Defendant Elevance Health, Inc., including Blue Cross of California d/b/a/ Anthem Blue Cross, Anthem Blue Cross Life and Health Insurance Company, and Blue Cross of Southern California, are collectively referred to as "Anthem Blue Cross of California" or "Anthem-CA."  Anthem-CA exercises market dominance as a Blue in California or within areas of California.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-CA has agreed to and participates in the challenged conduct.

54.    **Blue Cross of Southern California**. Defendant Blue Cross of Southern California is a California company with its headquarters located at One Wellpoint Way, Thousand Oaks, CA 91362.  It is a subsidiary of Defendant Elevance Health, Inc.  Blue Cross of Southern California, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers of various health care plans in California.  Blue Cross of Southern California and its subsidiaries, affiliated companies, and companies under the common ownership of Defendant Elevance Health, Inc., including Blue Cross of California d/b/a/ Anthem Blue Cross, Anthem Blue Cross Life and Health Insurance Company, and Blue Cross of Northern California, are collectively referred to as "Anthem Blue Cross of California" or "Anthem-CA."  Anthem-CA exercises market dominance as a Blue in California or within areas of California.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-CA has agreed to and participates in the challenged conduct.

55.    **Anthem-CO**.  Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado is a Colorado company with its headquarters located at 700 Broadway, Denver, CO 80203.  It is a subsidiary of Defendant Elevance Health, Inc. Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Colorado.  Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield of Colorado and its subsidiaries and affiliated companies in Colorado are collectively referred to as "Anthem Blue Cross and Blue Shield of Colorado" or "Anthem-CO" in this Complaint.  Anthem-CO exercises market dominance as a Blue in Colorado or within areas of Colorado.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-CO has agreed to and participates in the challenged conduct.

56.    **Anthem-CT**.  Defendant Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield is a Connecticut company with its headquarters located at 370 Bassett Road, North Haven, CT 06473.  It is a subsidiary of Defendant Elevance Health, Inc. Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Connecticut. Anthem Health Plans, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Connecticut" or "Anthem-CT."  Anthem-CT exercises market dominance as a Blue in Connecticut or within areas of Connecticut.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-CT has agreed to and participates in the challenged conduct.

57.    **Anthem-GA**.  Defendant Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., a health maintenance organization, is a Georgia company with headquarters located at 3350 Peachtree Road NE, Atlanta, GA 30326.  It is a subsidiary of Defendant Elevance Health, Inc.  Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Georgia.  Blue Cross and Blue Shield Healthcare Plan of Georgia, Inc., its subsidiaries and affiliated companies in Georgia are collectively referred to as "Anthem Blue Cross and Blue Shield of Georgia" or "Anthem-GA" in this Complaint.  Anthem-GA exercises market dominance as a Blue in Georgia or within areas of Georgia.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-GA has agreed to and participates in the challenged conduct.

58.    **Anthem-IN**.  Defendant Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana and Anthem Blue Cross and Blue Shield is an Indiana company with its headquarters located at 120 Monument Circle, Indianapolis, IN 46204.  It is a subsidiary of Defendant Elevance Health, Inc.  Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana and Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Indiana.  Anthem Insurance Companies, Inc. d/b/a Blue Cross and Blue Shield of Indiana and Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Indiana" or "Anthem-IN" in this Complaint.  Anthem-IN exercises market dominance as a Blue in Indiana or within areas of Indiana.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-IN has agreed to and participates in the challenged conduct.

19

59.    **Anthem-KY**.  Defendant Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield is a Kentucky company with its headquarters located at 13550 Triton Park Blvd., Louisville, KY 40223.  It is a subsidiary of Defendant Elevance Health, Inc. Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries and affiliated companies, provides health insurance to subscribers to various health care plans in Kentucky.  Anthem Health Plans of Kentucky, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Kentucky" or "Anthem-KY" in this Complaint.  Anthem-KY exercises market dominance as a Blue in Kentucky or within areas of Kentucky.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-KY has agreed to and participates in the challenged conduct.

60.    **Anthem-ME**.  Defendant Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield and d/b/a Associated Hospital Service is a Maine company with its headquarters located at 2 Gannett Drive, South Portland, ME 04016.  It is a subsidiary of Defendant Elevance Health, Inc.  Anthem Health Plans of Maine, Inc. d/b/a Anthem Blue Cross and Blue Shield and d/b/a Associated Hospital Service, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Maine.  Anthem Health Plans of Maine d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Maine" or "Anthem-ME" in this Complaint.  Anthem-ME exercises market dominance as a Blue in Maine or within areas of Maine.   Through its own actions and through its subsidiaries or affiliated companies, Anthem-ME has agreed to and participates in the challenged conduct.

61.    **Anthem-MO**.  Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri is a Missouri company with its headquarters located at 1831 Chestnut Street, St. Louis, MO 63103.  It is a subsidiary of Defendant Elevance Health, Inc. HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Missouri. Defendant HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri and its subsidiaries and affiliated companies, including Health Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield, are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "Anthem-MO" in this Complaint.  Anthem-MO exercises market dominance as a Blue in Missouri or within areas of Missouri.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-MO has agreed to and participates in the challenged conduct.

62.    **Health Alliance Life Insurance Company**.  Defendant Health Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield is a Missouri company with its headquarters located at 1831 Chestnut Street, St. Louis, MO 63103.  It is a subsidiary of Defendant Elevance Health, Inc. Health Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Missouri.  Health Alliance Life Insurance Company d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies, including HMO Missouri, Inc. d/b/a Anthem Blue Cross and Blue Shield of Missouri, are collectively referred to as "Anthem Blue Cross and Blue Shield of Missouri" or "Anthem-MO" in this Complaint.  Anthem-MO exercises market dominance as a Blue in Missouri or within areas of

Missouri.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-MO has agreed to and participates in the challenged conduct.

63.    **Anthem-NV**.  Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield Nevada is a Nevada company with its principal place of business at 9133 West Russell Rd. Suite 200, Las Vegas, NV 89148.  It is a subsidiary of Defendant Elevance Health, Inc. Defendant Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield Nevada, itself or through its subsidiaries and affiliated companies, provides health insurance to subscribers to various health care plans in Nevada.  Rocky Mountain and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield Nevada and its subsidiaries and affiliated companies in Nevada are collectively referred to as "Anthem Blue Cross and Blue Shield of Nevada" or "Anthem-NV" in this Complaint.  Anthem-NV exercises market dominance as a Blue in Nevada or within areas of Nevada.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-NV has agreed to and participates in the challenged conduct.

64.    **Anthem-NH**.  Defendant Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield is a New Hampshire company with its headquarters located at 3000 Goffs Falls Rd, Manchester, NH 03103.  It is a subsidiary of Defendant Elevance Health, Inc.  Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New Hampshire.  Anthem Health Plans of New Hampshire, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of New Hampshire" or "Anthem-NH" in this Complaint.  Anthem-NH exercises market dominance as a Blue in New Hampshire or

within areas of New Hampshire.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-NH has agreed to and participates in the challenged conduct.

65.    **Anthem-NY**.  Defendant Anthem HealthChoice Assurance, Inc., f/k/a Empire HealthChoice Assurance, Inc., d/b/a Anthem Blue Cross and d/b/a Anthem Blue Cross and Blue Shield, formerly d/b/a Empire BlueCross BlueShield, is a New York company with its headquarters located at One Liberty Plaza, New York, NY 10006.  It is a subsidiary of Defendant Elevance Health, Inc.  Anthem HealthChoice Assurance, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New York.  Anthem HealthChoice Assurance, Inc. and its subsidiaries and affiliated companies, including Anthem HealthChoice HMO, Inc., are collectively referred to as "Anthem Blue Cross and Blue Shield of New York" or "Anthem NY" in this Complaint.  Anthem NY exercises market dominance as a Blue in areas within New York.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-NY has agreed to and participates in the challenged conduct.

66.    **Anthem HealthChoice HMO, Inc**.  Defendant Anthem HealthChoice HMO, Inc., f/k/a Empire HealthChoice HMO, Inc., is a New York company with its headquarters located at One Liberty Plaza, New York, NY 10006.  It is a subsidiary of Defendant Elevance Health, Inc. Anthem HealthChoice HMO, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New York.  Anthem HealthChoice HMO, Inc. and its subsidiaries and affiliated companies, including Anthem HealthChoice Assurance, Inc., are collectively referred to as "Anthem Blue Cross and Blue Shield of New York" or "Anthem NY" in this Complaint.  Anthem NY exercises market dominance as a

Blue within areas of New York.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-NY has agreed to and participates in the challenged conduct.

67.     **Anthem-OH**.  Defendant Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio is an Ohio company with its headquarters located at 3075 Vandercar Way Cincinnati, OH 45209.  It is a subsidiary of Defendant Elevance Health, Inc. Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Ohio.  Community Insurance Company d/b/a Anthem Blue Cross and Blue Shield of Ohio and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Ohio" or "Anthem-OH."  Anthem-OH exercises market dominance as a Blue in Ohio or within areas of Ohio.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-OH has agreed to and participates in the challenged conduct.

68.     **Anthem-VA**.  Defendant Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield is a Virginia company with its headquarters located in Virginia.  It is a subsidiary of Defendant Elevance Health, Inc. Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans at 2235 Staples Mill Road, Suite 401, Richmond, VA 23230.  Anthem Health Plans of Virginia, Inc. d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Anthem Blue Cross and Blue Shield of Virginia" or "Anthem-VA" in this Complaint.  Anthem-VA exercises market dominance as a Blue in Virginia or within areas of Virginia.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-VA has agreed to and participates in the challenged conduct.

69.    **Anthem-WI**.  Defendant Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield is a Wisconsin company with its headquarters located in Wisconsin.  It is a subsidiary of Defendant Elevance Health, Inc. Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield, itself or through its subsidiaries or affiliated companies, including Compcare Health Services Insurance Corporation and Claim Management Services, Inc., provides health insurance to subscribers to various health care plans at N17 W24340 Riverwood Drive Waukesha, WI 53188.  Blue Cross Blue Shield of Wisconsin d/b/a Anthem Blue Cross and Blue Shield and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wisconsin" or "Anthem-WI" in this Complaint.  Anthem-WI exercises market dominance as a Blue in Wisconsin or within areas of Wisconsin.  Through its own actions and through its subsidiaries or affiliated companies, Anthem-WI has agreed to and participates in the challenged conduct.

### D.    Aware Defendants

70.    **Aware**.  Defendant Aware Integrated, Inc. is a Minnesota entity with its principal place of business at 3535 Blue Cross Road, St. Paul, MN 55164.  It operates under the following names or subsidiaries: Blue Cross and Blue Shield of Minnesota; Blue Plus; MII Life, Incorporated; MII Services, Inc.; Comprehensive Care Services, Inc.; Pharmacy Gold, Inc.; ClearStone Solutions; SupportSource, Inc.; Invitation Health and Wellness, Inc.; Invitation Health Institute; and Capital Asset Care, Inc. Aware Integrated, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Minnesota.  Aware Integrated, Inc. and its subsidiaries and affiliated companies, including BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota, are collectively referred to as "Aware" in this Complaint.  Aware exercises market dominance as a Blue in Minnesota or within

areas of Minnesota.  Through its own actions and through its subsidiaries, Aware has agreed to and participates in the challenged conduct.

71.    **Aware-MN**.  Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a Minnesota company with its headquarters located at 3535 Blue Cross Road, St. Paul, MN 55164.  BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota is a wholly owned subsidiary of Aware Integrated, Inc. BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Minnesota.  BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota and its subsidiaries and affiliated companies, together with Aware Integrated, Inc., are collectively referred to as "Blue Cross and Blue Shield of Minnesota" or "Aware-MN" in this Complaint.  Aware-MN exercises market dominance as a Blue in Minnesota or within areas of Minnesota.  Through its own actions and through its subsidiaries or affiliated companies, Aware-MN has agreed to and participates in the challenged conduct.

### E.    BCBS-AL Defendant

72.    **BCBS-AL**.  Defendant Blue Cross and Blue Shield of Alabama is an Alabama company with its headquarters located in Alabama.  It is the health insurance company operating under the Blue Cross and Blue Shield trademarks and trade names at 450 Riverchase Parkway East, Birmingham, AL 35244.  Blue Cross and Blue Shield of Alabama, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Alabama.  It is the largest provider of health care insurance and administrative services for health care plans in Alabama.  Blue Cross and Blue Shield of Alabama and its subsidiaries and affiliated companies are collectively referred to as "BCBS-AL" in this Complaint.  BCBS-AL exercises market dominance as a Blue in Alabama or within areas of Alabama.  Through its own

actions and through its subsidiaries or affiliated companies, BCBS-AL has agreed to and participates in the challenged conduct.

**F.**     **BCBS-HI Defendant**

73.     **BCBS-HI**.  Defendant Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii is a mutual benefit society under the laws of Hawaii with its headquarters located at 818 Keeaumoku Street, Honolulu, HI 96814.  Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Hawaii.  Hawaii Medical Service Association d/b/a Blue Cross and Blue Shield of Hawaii and its subsidiaries and affiliated companies are collectively referred to as "Hawaii Medical Service Association" or "BCBS-HI" in this Complaint.  BCBS-HI exercises market dominance as a Blue in Hawaii or within areas of Hawaii.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-HI has agreed to and participates in the challenged conduct.

**G.**     **BCBS-KS Defendant**

74.     **BCBS-KS**.  Defendant Blue Cross and Blue Shield of Kansas, Inc. is a Kansas company with its headquarters located at 1133 SW Topeka Boulevard, Topeka, KS 66629.  Blue Cross and Blue Shield of Kansas, Inc., itself or through subsidiaries or affiliated companies including Premier Health, Inc., provides health insurance to subscribers to various health care plans in Kansas.  Blue Cross and Blue Shield of Kansas, Inc. and its subsidiaries and affiliated companies, including Premier Health, Inc., are collectively referred to as "Blue Cross and Blue Shield of Kansas" or "BCBS-KS."  BCBS-KS exercises market dominance as a Blue in Kansas or within areas of Kansas.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-KS has agreed to and participates in the challenged conduct.

### H.    BCBS-KC Defendant

75.    **BCBS-KC**.  Defendant Blue Cross and Blue Shield of Kansas City is a Missouri corporation with its corporate headquarters located at 2301 Main Street, One Pershing Square, Kansas City, MO 64108.  Blue Cross and Blue Shield of Kansas City, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Kansas City and its suburbs in Kansas and Missouri.  Blue Cross and Blue Shield of Kansas City and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Kansas City," or "BCBS-KC" in this Complaint.  BCBS-KC exercises market dominance as a Blue in parts of Kansas and Missouri.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-KC has agreed to and participates in the challenged conduct.

### I.    BCBS-LA Defendant

76.    **BCBS-LA**.  Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana is a Louisiana company with its headquarters located in Louisiana. Defendant Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans at 5525 Reitz Avenue, Baton Rouge, LA 70809.  Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Louisiana" or "BCBS-LA" in this Complaint.  BCBS-LA exercises market dominance as a Blue in Louisiana or within areas of Louisiana.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-LA has agreed to and participates in the challenged conduct.

### J.    BCBS-MI Defendant

77.    **BCBS-MI**.  Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company is a Michigan nonprofit mutual insurance company with its headquarters located at 600 E. Lafayette Blvd., Detroit, MI 48226.  Blue Cross Blue Shield of Michigan Mutual Insurance Company, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Michigan.  Defendant Blue Cross Blue Shield of Michigan Mutual Insurance Company and its subsidiaries and affiliated companies in Michigan are collectively referred to as "Blue Cross and Blue Shield of Michigan" or "BCBS-MI" in this Complaint.  BCBS-MI exercises market dominance as a Blue in Michigan or within areas of Michigan.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-MI has agreed to and participates in the challenged conduct.

### K.    BCBS-MS Defendant

78.    **BCBS-MS**. Defendant Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company, is incorporated in Mississippi and has its headquarters located at 3545 Lakeland Drive, Flowood, MS 39232.  Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Mississippi.  Blue Cross & Blue Shield of Mississippi, a Mutual Insurance Company and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Mississippi" or "BCBS-MS" in this Complaint. BCBS-MS exercises market dominance as a Blue in Mississippi or within areas of Mississippi.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-MS has agreed to and participates in the challenged conduct.

L.    **BCBS-NC Defendant**

79.    **BCBS-NC**.  Defendant Blue Cross and Blue Shield of North Carolina, Inc. is a North Carolina not-for-profit corporation with its headquarters located at 5901 Chapel Hill Road, Durham, NC 27707.  Blue Cross and Blue Shield of North Carolina, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in North Carolina.  Blue Cross and Blue Shield of North Carolina, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of North Carolina" or "BCBS-NC" in this Complaint.  BCBS-NC exercises market dominance as a Blue in North Carolina or within areas of North Carolina.

M.    **BCBS-RI Defendant**

80.    **BCBS-RI**.  Defendant Blue Cross Blue Shield of Rhode Island is a Rhode Island company with its headquarters located at 500 Exchange Street, Providence, RI 02903.  Blue Cross Blue Shield of Rhode Island, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Rhode Island.  Blue Cross Blue Shield of Rhode Island and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Rhode Island" or "BCBS-RI" in this Complaint.  BCBS-RI exercises market dominance as a Blue in Rhode Island or within areas of Rhode Island.  Through its own actions and through its subsidiaries or affiliated companies, BCBS-RI has agreed to and participates in the challenged conduct.

N.    **BCBS-SC Defendant**

81.    **BCBS-SC**.  Defendant BlueCross BlueShield of South Carolina is a South Carolina company with its headquarters located in South Carolina.  BlueCross BlueShield of South Carolina, itself or through its subsidiaries or affiliated companies, provides health insurance to over one million subscribers to various health care plans in South Carolina.  BlueCross BlueShield

of South Carolina and its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of South Carolina" or "BCBS-SC" in this Complaint. BCBS-SC exercises market dominance as a Blue in South Carolina or within areas of South Carolina. Through its own actions and through its subsidiaries or affiliated companies, BCBS-SC has agreed to and participates in the challenged conduct.

82.     The principal headquarters for BCBS-SC is located at 2501 Faraway Drive, Columbia, SC 29212

### O.     **BCBS-TN Defendant**

83.     **BCBS-TN**. Defendant BlueCross BlueShield of Tennessee, Inc. is a Tennessee company with its headquarters located at 1 Cameron Hill Circle, Chattanooga, TN 37402. Defendant BlueCross BlueShield of Tennessee, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Tennessee. BlueCross BlueShield of Tennessee, Inc. and its subsidiaries and affiliated companies are collectively referred to as "BlueCross BlueShield of Tennessee" or "BCBS-TN" in this Complaint. BCBS-TN exercises market dominance as a Blue in Tennessee or within areas of Tennessee. Through its own actions and through its subsidiaries or affiliated companies, BCBS-TN has agreed to and participates in the challenged conduct.

### P.     **BCBS-VT**

84.     **BCBS-VT**. Defendant Blue Cross and Blue Shield of Vermont is a Vermont nonprofit hospital/medical service corporation with headquarters located at 445 Industrial Lane, Berlin, VT 05602. It was acquired by BCBS-MI in 2023. Blue Cross and Blue Shield of Vermont, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans within the state of Vermont. Blue Cross and Blue Shield of Vermont and its subsidiaries and affiliated companies in Vermont are collectively referred to as "Blue Cross

and Blue Shield of Vermont" or "BCBS-VT" in this Complaint. BCBS-VT exercises market dominance as a Blue in Vermont or within areas of Vermont. Through its own actions and through its subsidiaries or affiliated companies, BCBS-VT has agreed to and participates in the challenged conduct.

### Q.     **BCBS-WY**

85.     **BCBS-WY**. Defendant Blue Cross Blue Shield of Wyoming is a Wyoming corporation with its headquarters located at 4000 House Avenue Cheyenne, WY 82001. Blue Cross Blue Shield of Wyoming, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Wyoming. Blue Cross Blue Shield of Wyoming and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of Wyoming" or "BCBS-WY" in this Complaint. BCBS-WY exercises market dominance as a Blue in Wyoming or within areas of Wyoming. Through its own actions and through its subsidiaries or affiliated companies, BCBS-WY has agreed to and participates in the challenged conduct.

### R.     **BS-CA Defendant**

86.     **BS-CA**. Defendant California Physicians' Service, Inc. d/b/a Blue Shield of California is a California company with its headquarters located at 50 Beale Street, San Francisco, CA 94105-1808. California Physicians' Service, Inc. d/b/a Blue Shield of California, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in California. California Physicians' Service, Inc. d/b/a Blue Shield of California and its subsidiaries and affiliated companies are collectively referred to as "Blue Shield of California" or "BS-CA" in this Complaint. BS-CA exercises market dominance as a Blue in California or within areas of California. Through its own actions and through its subsidiaries or affiliated companies, BS-CA has agreed to and participates in the challenged conduct.

S.    **Cambia Defendants**

87.    **Cambia**.    Defendant Cambia Health Solutions, Inc., formerly known as The Regence Group, Inc., is an Oregon corporation with its corporate headquarters located at 200 SW Market Street, Portland, OR 97201.    Cambia Health Solutions, Inc. is one of the largest health insurers in the Pacific Northwest and Mountain regions.    Cambia Health Solutions, Inc., through its subsidiary companies and its affiliated companies, including Regence BlueShield of Idaho, Inc., Regence Insurance Holding Corporation, Regence BlueCross BlueShield of Oregon, Regence BlueCross BlueShield of Utah, and Regence BlueShield (Washington), exercises market dominance as a Blue in its states of operation (Idaho, Oregon, Utah, and Washington) or within areas of those states.    Cambia Health Solutions, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Cambia" in this Complaint.    Through its own actions and through its subsidiaries or affiliated companies, Cambia has agreed to and participates in the challenged conduct.

88.    **Regence-ID**.    Defendant Regence BlueShield of Idaho, Inc. is an Idaho company with its headquarters located at 1602 21st Ave, Lewiston, ID 83501.    It is a subsidiary of Defendant Cambia Health Solutions, Inc.    Regence BlueShield of Idaho, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Idaho.    Regence BlueShield of Idaho, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Regence BlueShield of Idaho" or "Regence-ID" in this Complaint. Regence-ID exercises market dominance as a Blue in Idaho or within areas of Idaho.    Through its own actions and through its subsidiaries or affiliated companies, Regence-ID has agreed to and participates in the challenged conduct.

89.    **Regence-OR**.    Defendant Regence BlueCross BlueShield of Oregon is an Oregon company with its headquarters located at 100 SW Market Street, Portland, OR 97207.    It is a

subsidiary of Defendant Cambia Health Solutions, Inc. Regence BlueCross BlueShield of Oregon, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Oregon. Regence BlueCross BlueShield of Oregon and its subsidiaries and affiliated companies in Oregon are collectively referred to as "Blue Cross and Blue Shield of Oregon" or "Regence-OR" in this Complaint. Regence-OR exercises market dominance as a Blue in Oregon or within areas of Oregon. Through its own actions and through its subsidiaries or affiliated companies, Regence-OR has agreed to and participates in the challenged conduct.

90.    **Regence-UT**. Defendant Regence BlueCross BlueShield of Utah is a Utah company with its headquarters located at 2890 East Cottonwood Parkway, Salt Lake City, UT 84121. It is a subsidiary of Defendant Cambia Health Solutions, Inc. Regence BlueCross BlueShield of Utah, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Utah. Regence BlueCross BlueShield of Utah and its subsidiaries and affiliated companies in Utah are collectively referred to as "Blue Cross and Blue Shield of Utah" or "Regence-UT" in this Complaint. Regence-UT exercises market dominance as a Blue in Utah or within areas of Utah. Through its own actions and through its subsidiaries or affiliated companies, Regence-UT has agreed to and participates in the challenged conduct.

91.    **Regence-WA**. Defendant Regence BlueShield is a Washington nonprofit corporation with its headquarters located at 1800 Ninth Avenue, Seattle, WA 98111. It is a subsidiary of Defendant Cambia Health Solutions, Inc. Regence BlueShield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Washington. Regence BlueShield and its subsidiaries and affiliated companies in

Washington are collectively referred to as "Blue Shield of Washington" or "Regence-WA" in this Complaint. Regence-WA exercises market dominance as a Blue in Washington or within areas of Washington. Through its own actions and through its subsidiaries or affiliated companies, Regence-WA has agreed to and participates in the challenged conduct.

**T.    Capital-PA Defendant**

92.    **Capital-PA**. Defendant Capital Blue Cross is a Pennsylvania company with its principal place of business in Pennsylvania, operating within 21 counties in central Pennsylvania. The principal headquarters for Capital-PA is located at 2500 Elmerton Avenue, Harrisburg, PA 17177. Capital Blue Cross is the parent company to Capital Advantage Insurance Company, Capital Advantage Assurance Company, and Keystone Health Plan Central. Capital Blue Cross, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Pennsylvania. Capital Blue Cross and its subsidiaries and affiliated companies are collectively referred to as "Capital-PA" in this Complaint. Capital-PA exercises market dominance as a Blue in areas of Pennsylvania. Through its own actions and through its subsidiaries or affiliated companies, Capital-PA has agreed to and participates in the challenged conduct.

**U.    CareFirst Defendants**

93.    **CareFirst**. Defendant CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield is a Maryland corporation with its headquarters located in Maryland and the District of Columbia. CareFirst, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Washington, D.C., Maryland, and areas in northern Virginia. It is the largest health care insurer in the Mid-Atlantic Region. CareFirst, Inc. and its subsidiaries and affiliated companies are collectively referred to as "CareFirst" in this Complaint. Through its subsidiaries and affiliated companies, CareFirst exercises market dominance as a Blue

in Maryland, Washington, D.C., and northern Virginia, or in areas within Maryland, Washington, D.C., and northern Virginia.  Through its own actions and through its subsidiaries or affiliated companies, CareFirst has agreed to and participates in the challenged conduct.

94.    The principal headquarters for CareFirst is located at 10453 and 10455 Mill Run Circle, Owings Mill, MD 21117.

95.    **CareFirst BlueChoice, Inc**.  Defendant CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield is a Maryland corporation with its headquarters located in Maryland and the District of Columbia.  The principal headquarters for CareFirst is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117.  CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield, itself or through its subsidiaries or affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield and Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield, provides health insurance to subscribers to various health care plans in Washington, D.C., Maryland, and areas in northern Virginia.  CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield and its subsidiaries and affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield and Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield, are collectively referred to as "CareFirst" in this Complaint.  CareFirst exercises market dominance as a Blue in Maryland, Washington, D.C., and northern Virginia, or in areas within Washington, D.C., Maryland, and northern Virginia. Through its own actions and through its subsidiaries or affiliated companies, CareFirst has agreed to and participates in the challenged conduct.

96.    **Group Hospitalization and Medical Services, Inc**.  Defendant Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield is a Maryland corporation with its headquarters located in Maryland and the District of Columbia.  The principal

headquarters for CareFirst is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117. Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield, itself or through its subsidiaries or affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield and CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield, provides health insurance to subscribers to various health care plans in Maryland, Washington, D.C., Maryland, and northern Virginia. Group Hospitalization and Medical Services, Inc. d/b/a CareFirst BlueCross BlueShield and its subsidiaries and affiliated companies, including CareFirst, Inc. d/b/a CareFirst BlueCross BlueShield and CareFirst BlueChoice, Inc. d/b/a CareFirst BlueCross BlueShield, are collectively referred to as "CareFirst" in this Complaint. CareFirst exercises market dominance as a Blue in Maryland, Washington, D.C., and northern Virginia, or in areas within Washington, D.C., Maryland, and northern Virginia. Through its own actions and through its subsidiaries or affiliated companies, CareFirst has agreed to and participates in the challenged conduct.

97. **CareFirst of Maryland, Inc**. Defendant CareFirst of Maryland, Inc. d/b/a CareFirst BlueCross BlueShield is a Maryland corporation with its headquarters located in Maryland and the District of Columbia. The principal headquarters for CareFirst is located at 10455 and 10453 Mill Run Circle, Owings Mill, MD 21117. CareFirst of Maryland, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Maryland. CareFirst of Maryland, Inc. and its subsidiaries and affiliated companies in Maryland, and CareFirst, Inc., are collectively referred to as "CareFirst" in this Complaint. CareFirst exercises market dominance as a Blue in Maryland or within areas of Maryland. Through its own actions and through its subsidiaries or affiliated companies, CareFirst has agreed to and participates in the challenged conduct.

### V.    Excellus Defendants

98.    **Excellus**.  Defendant Lifetime Healthcare, Inc. is a New York company with its headquarters located at 165 Court Street, Rochester, NY 14647.  It is the parent of Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield. Lifetime Healthcare, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New York.  Lifetime Healthcare, Inc., and its subsidiaries and affiliated companies, including Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, are collectively referred to as "Excellus" in this Complaint.  Excellus exercises market dominance as a Blue in areas within New York.  Through its own actions and through its subsidiaries or affiliated companies, Excellus has agreed to and participates in the challenged conduct.

99.    **Excellus-NY**. Defendant Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a New York company with its headquarters located at 165 Court Street, Rochester, NY 14647.  Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield is a subsidiary of Lifetime Healthcare, Inc.  Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New York.  Excellus Health Plan, Inc. d/b/a Excellus BlueCross BlueShield and its subsidiaries and affiliated companies are collectively referred to as "Excellus-NY" in this Complaint.  Excellus-NY exercises market dominance as a Blue in areas within New York.  Through its own actions and through its subsidiaries or affiliated companies, Excellus-NY has agreed to and participates in the challenged conduct.

### W.    Gemstone Defendants

100.    **Gemstone**.  Defendant Gemstone Holdings, Inc. is an Idaho nonprofit mutual holding company with its headquarters located 3000 East Pine Avenue, Meridian, ID 83642.  It is the parent company of Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho.

Gemstone Holdings, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Idaho. Gemstone Holdings, Inc. and its subsidiaries and affiliated companies, including Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho, are collectively referred to as "Gemstone" in this Complaint. Gemstone exercises market dominance as a Blue in Idaho or within areas of Idaho. Through its own actions and through its subsidiaries or affiliated companies, Gemstone has agreed to and participates in the challenged conduct.

101.     **Gemstone-ID**. Defendant Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho is an Idaho company with its headquarters located at 3000 East Pine Avenue, Meridian, ID 83642. Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Idaho. Blue Cross of Idaho Health Service, Inc. d/b/a Blue Cross of Idaho and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross of Idaho" or "Gemstone-ID" in this Complaint. Gemstone-ID exercises market dominance as a Blue in Idaho or within areas of Idaho. Through its own actions and through its subsidiaries or affiliated companies, Gemstone-ID has agreed to and participates in the challenged conduct.

### X.     Goodlife Defendants

102.     **GoodLife**. Defendant GoodLife Partners, Inc. is a Nebraska mutual insurance holding company with its principal place of business in Nebraska. The principal headquarters for GoodLife is located at 1919 Aksarban Drive, Omaha, NE 68180. GoodLife Partners, Inc. is the parent company of Blue Cross and Blue Shield of Nebraska. GoodLife Partners, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Nebraska. GoodLife Partners, Inc. and its subsidiaries and affiliated companies, including and Blue Cross and Blue Shield of Nebraska, are collectively referred to as

"GoodLife" in this Complaint. GoodLife exercises market dominance as a Blue in Nebraska or within areas of Nebraska. Through its own actions and through its subsidiaries or affiliated companies, GoodLife has agreed to and participates in the challenged conduct.

103.    **GoodLife-NE**. Defendant Blue Cross and Blue Shield of Nebraska is a Nebraska company with its headquarters located at 1919 Aksarban Drive, Omaha, NE 68180. Blue Cross and Blue Shield of Nebraska, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Nebraska. Blue Cross and Blue Shield of Nebraska and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Nebraska" or "GoodLife-NE" in this Complaint. GoodLife-NE exercises market dominance as a Blue in Nebraska or within areas of Nebraska. Through its own actions and through its subsidiaries or affiliated companies, GoodLife-NE has agreed to and participates in the challenged conduct.

### Y.    GuideWell Defendants

104.    **GuideWell**. Defendant GuideWell Mutual Holding Corporation is a Florida mutual insurance holding company with its principal place of business in Florida. The principal headquarters for GuideWell is located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246. GuideWell Mutual Holding Corporation is the parent of Blue Cross and Blue Shield of Florida, Inc. and the parent of Triple-S Management Corporation, which itself is the parent of Triple-S Salud, Inc. GuideWell Mutual Holding Corporation and its subsidiaries and affiliated companies are collectively referred to as "GuideWell" in this Complaint. GuideWell exercises market dominance as a Blue in Florida and Puerto Rico or within areas of Florida and Puerto Rico. Through its own actions and through its subsidiaries, GuideWell has agreed to and participates in the challenged conduct.

105.    **GuideWell-FL**.  Defendant Blue Cross and Blue Shield of Florida, Inc. is a Florida mutual insurance holding company with its principal place of business in Florida.  The principal headquarters for GuideWell-FL is located at 4800 Deerwood Campus Parkway, Jacksonville, FL 32246.  It is a subsidiary of Defendant GuideWell Mutual Holding Corporation.  Blue Cross and Blue Shield of Florida, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Florida.  Blue Cross and Blue Shield of Florida, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross and Blue Shield of Florida" or "GuideWell-FL" in this Complaint.  GuideWell-FL exercises market dominance as a Blue in Florida or within areas of Florida.  Through its own actions and through its subsidiaries or affiliated companies, GuideWell-FL has agreed to and participates in the challenged conduct.

106.    **GuideWell-PR**.  Defendant Triple-S Management Corporation is a Puerto Rico company with its headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.  It is a subsidiary of Defendant GuideWell Mutual Holding Corporation.  It is the parent of Triple-S Salud, Inc.  Triple-S Management Corporation, itself and through its subsidiaries and affiliated companies, including Triple-S Salud, Inc., provides health insurance to subscribers to various health care plans in Puerto Rico.  Triple-S Management Corporation and its subsidiaries and affiliated companies, including Triple-S Salud, Inc., are collectively referred to as "GuideWell-PR" in this Complaint.  GuideWell-PR exercises market dominance as a Blue in Puerto Rico or within areas of Puerto Rico.  Through its own actions and through its subsidiaries or affiliated companies, GuideWell-PR has agreed to and participates in the challenged conduct.

107.    **Triple-S Salud, Inc**.  Defendant Triple-S Salud, Inc. is a Puerto Rico company with its headquarters located at 1441 F.D. Roosevelt Avenue, San Juan, Puerto Rico 00920.  Triple-

S Salud, Inc., itself and through its subsidiaries and affiliated companies, including Triple-S Management Corporation, provides health insurance to subscribers to various health care plans in Puerto Rico. Triple-S Salud, Inc. and its subsidiaries and affiliated companies, including Triple-S Management Corporation, are collectively referred to as "GuideWell-PR" in this Complaint. GuideWell-PR exercises market dominance as a Blue in Puerto Rico or within areas of Puerto Rico. Through its own actions and through its subsidiaries or affiliated companies, GuideWell-PR has agreed to and participates in the challenged conduct.

**Z.    HCSC Defendants**

108.    **HCSC**. Defendant Health Care Service Corporation is an Illinois Mutual Legal Reserve Company with its corporate headquarters located at 300 East Randolph Street, Chicago, IL 60601. Health Care Service Corporation is one of the largest health insurers in the United States. Health Care Service Corporation does business as Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Montana, Blue Cross and Blue Shield of New Mexico, Blue Cross and Blue Shield of Oklahoma, Blue Cross and Blue Shield of Texas. Health Care Service Corporation, itself and through its divisions, subsidiaries, and affiliated companies, operates Blues in numerous states, including Illinois, Montana, New Mexico, Oklahoma, and Texas. In each of its five states or areas within those states, Health Care Service Corporation exercises market dominance. Health Care Service Corporation and its divisions, subsidiaries, and affiliated companies are collectively referred to as "HCSC" in this Complaint. Through its own actions and through its divisions, subsidiaries, and affiliated companies, HCSC has agreed to and participates in the challenged conduct.

109.    **HCSC-IL**. Defendant Blue Cross and Blue Shield of Illinois is a division of Defendant HCSC with its principal place of business located 300 E. Randolph Street, Chicago, IL 60601. Blue Cross and Blue Shield of Illinois, itself or through its subsidiaries or affiliated

companies provides health insurance to subscribers to various health care plans in Illinois.  Blue Cross and Blue Shield of Illinois and its subsidiaries and affiliated companies in Illinois are collectively referred to as "Blue Cross and Blue Shield of Illinois" or "HCSC-IL" in this Complaint.  HCSC-IL exercises market dominance as a Blue in Illinois or within areas of Illinois. Through its own actions and through its subsidiaries or affiliated companies, HCSC-IL has agreed to and participates in the challenged conduct.

110.    **HCSC-MT**.  Defendant Blue Cross and Blue Shield of Montana is a division of Defendant HCSC with its principal place of business in Montana.  The principal headquarters for HCSC-MT is located at 560 N. Park Avenue, Helena, MT 59604-4309.  Blue Cross and Blue Shield of Montana, itself or through its subsidiaries or affiliates, provides health insurance to subscribers to various health care plans in Montana.  Blue Cross and Blue Shield of Montana and its subsidiaries and affiliated companies in Montana are collectively referred to as "Blue Cross and Blue Shield of Montana" or "HCSC-MT" in this Complaint.  For purposes of this Complaint, references to Blue Cross and Blue Shield of Montana are deemed to include Caring for Montanans, Inc. and Blue Cross and Blue Shield of Montana, Inc.  HCSC-MT exercises market dominance as a Blue in Montana or within areas of Montana.  Through its own actions and through its subsidiaries or affiliated companies, HCSC-MT has agreed to and participates in the challenged conduct.

111.    **Caring for Montanans, Inc**. Defendant Caring for Montanans, Inc. f/k/a Blue Cross and Blue Shield of Montana, Inc. is a Montana company with its headquarters located at 560 N. Park Avenue, Helena, MT 59604-4309.  When Blue Cross and Blue Shield of Montana, Inc. was sold to Defendant HCSC, certain of its liabilities including certain liabilities relating to litigation, remained with the corporation now known as Caring for Montanans, Inc. Caring for

Montanans, Inc., itself or through subsidiaries or affiliated companies, provides or has provided health insurance to subscribers to various health care plans in Montana. Caring for Montanans, Inc. and its subsidiaries and affiliated companies in Montana are collectively referred to as "Blue Cross and Blue Shield of Montana" or "HCSC-MT" in this Complaint. For purposes of this Complaint, references to Caring for Montanans, Inc. are deemed to include Blue Cross and Blue Shield of Montana and Blue Cross and Blue Shield of Montana, Inc. HCSC-MT exercises market dominance as a Blue in Montana or within areas of Montana. Through its own actions and through its subsidiaries or affiliated companies, HCSC-MT has agreed to and participates in the challenged conduct.

112. **HCSC-NM**. Defendant Blue Cross and Blue Shield of New Mexico is a division of Defendant HCSC with its principal place of business located in New Mexico. The principal headquarters for HCSC-NM is located at 5701 Balloon Fiesta Parkway Northeast, Albuquerque, NM 87113. Blue Cross and Blue Shield of New Mexico, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New Mexico. Blue Cross and Blue Shield of New Mexico and its subsidiaries and affiliated companies in New Mexico are collectively referred to as "Blue Cross and Blue Shield of New Mexico" or "HCSC-NM" in this Complaint. HCSC-NM exercises market dominance as a Blue in New Mexico or within areas of New Mexico. Through its own actions and through its subsidiaries or affiliated companies, HCSC-NM has agreed to and participates in the challenged conduct.

113. **HCSC-OK**. Defendant Blue Cross and Blue Shield of Oklahoma is a division of Defendant HCSC with its principal place of business located in Oklahoma. The principal headquarters for HCSC-OK is located at 1400 South Boston, Tulsa, OK 74119. Blue Cross and Blue Shield of Oklahoma, itself or through subsidiaries or affiliated companies, provides health

insurance to subscribers to various health care plans in Oklahoma. Blue Cross and Blue Shield of Oklahoma and its subsidiaries and affiliated companies in Oklahoma are collectively referred to as "Blue Cross and Blue Shield of Oklahoma" or "HCSC-OK" in this Complaint. HCSC-OK exercises market dominance as a Blue in Oklahoma or within areas of Oklahoma.

114. **HCSC-TX**. Defendant Blue Cross and Blue Shield of Texas is a division of Defendant HCSC with its principal place of business located in Texas. The principal headquarters for HCSC-TX is located at 1001 E. Lookout Drive, Richardson, TX 75082. Blue Cross and Blue Shield of Texas, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Texas. Blue Cross and Blue Shield of Texas and its subsidiaries and affiliated companies in Texas are collectively referred to as "Blue Cross and Blue Shield of Texas" or "HCSC-TX" in this Complaint. HCSC-TX exercises market dominance as a Blue in Texas or within areas of Texas. Through its own actions and through its subsidiaries or affiliated companies, HCSC-TX has agreed to and participates in the challenged conduct.

### AA.  HealthyDakota Defendants

115. **HealthyDakota**. Defendant HealthyDakota Mutual Holdings is a North Dakota company with its headquarters located at 4510 13th Avenue South, Fargo, ND 58121. It is the parent of Blue Cross Blue Shield of North Dakota f/k/a Noridian Mutual Insurance Company. HealthyDakota Mutual Holdings, itself or through subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in North Dakota. HealthyDakota Mutual Holdings and its subsidiaries and affiliated companies, including Blue Cross Blue Shield of North Dakota, are collectively referred to as "HealthyDakota" in this Complaint. HealthyDakota exercises market dominance as a Blue in North Dakota or within areas of North Dakota. Through its own actions and through its subsidiaries or affiliated companies, HealthyDakota has agreed to and participates in the challenged conduct.

116.  **HealthyDakota-ND**.  Defendant Blue Cross Blue Shield of North Dakota f/k/a Noridian Mutual Insurance Company is a North Dakota company with its headquarters at 4510 13th Avenue South, Fargo, ND 58121.  Blue Cross Blue Shield of North Dakota, itself or through subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in North Dakota.  Blue Cross Blue Shield of North Dakota and its subsidiaries and affiliated companies are collectively referred to as "Blue Cross Blue Shield of North Dakota" or "HealthyDakota-ND" in this Complaint.  HealthyDakota-ND exercises market dominance as a Blue in North Dakota or within areas of North Dakota.  Through its own actions and through its subsidiaries or affiliated companies, HealthyDakota-ND has agreed to and participates in the challenged conduct.

### BB.   Highmark Defendants

117.  **Highmark**.  Defendant Highmark Health is a Pennsylvania company with its headquarters located at 120 Fifth Avenue, Pittsburgh, PA 15222.  Highmark Health is the parent of Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware, Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue Shield of Northeastern New York, Highmark Inc., and Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia.  Highmark Health and its subsidiaries and affiliated companies are collectively referred to as "Highmark" in this Complaint. Highmark, itself and through its subsidiaries and affiliated companies, operates Blues in numerous states, including Delaware, New York, Pennsylvania, and West Virginia.  Highmark exercises market dominance as a Blue in the states in which it operates or within areas of those states.   Through its own actions and through its subsidiaries, Highmark has agreed to and participates in the challenged conduct.

118.    **Highmark-DE**.  Defendant Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware is Delaware company with its headquarters located at 800 Delaware Avenue, Wilmington, DE 19801.  It is a subsidiary of Highmark, Inc. Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware was formerly known as Blue Cross and Blue Shield of Delaware.  It became affiliated with Highmark, Inc. in 2011 and changed its name to Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware in 2012.  Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Delaware.  Highmark BCBSD Inc. d/b/a Highmark Blue Cross and Blue Shield Delaware and its subsidiaries and affiliated companies in Delaware are collectively referred to as "Highmark Blue Cross and Blue Shield Delaware" or "Highmark-DE" in this Complaint.  Highmark-DE exercises market dominance as a Blue in Delaware or within areas of Delaware.  Through its own actions and through its subsidiaries or affiliated companies, Highmark-DE has agreed to and participates in the challenged conduct.

119.    **Highmark-NY**.  Defendant Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue Shield of Northeastern New York,[2] is a New York company with its headquarters located at 1 Seneca St, 34th Floor, Buffalo, NY 14203.  It is a subsidiary of Defendant Highmark Health.  Highmark Western and Northeastern New York Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue Shield of Northeastern New York, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in

---

[2]  Highmark acquired HealthNow in 2021, which operated as BlueCross BlueShield of Western New York and as BlueShield of Northeastern New York.

western New York and northeastern New York.  Highmark Western and Northeastern New York

Inc. d/b/a Highmark Blue Cross Blue Shield of Western New York and d/b/a Highmark Blue

Shield of Northeastern New York and its subsidiaries and affiliated companies in New York are

collectively referred to as "Highmark Blue Cross and Blue Shield New York" or "Highmark-NY"

in this Complaint.  Highmark-NY exercises market dominance as a Blue in areas within New York.

Through its own actions and through its subsidiaries or affiliated companies, Highmark-NY has

agreed to and participates in the challenged conduct.

120.    **Highmark-PA**.  Defendant Highmark Inc. f/k/a Highmark Health Services, d/b/a

Highmark Blue Cross Blue Shield in western Pennsylvania and northeastern Pennsylvania and

d/b/a Highmark Blue Shield in central Pennsylvania and southeastern Pennsylvania, is a

Pennsylvania company with its headquarters located at 120 Fifth Avenue Place, Pittsburgh, PA

15222.  It is a subsidiary of Defendant Highmark Health. Highmark Inc., itself or through its

subsidiaries or affiliated companies, provides health insurance to subscribers to various health

plans in Pennsylvania. Highmark Inc. f/k/a Highmark Health Services, d/b/a Highmark Blue Cross

Blue Shield in western Pennsylvania and northeastern Pennsylvania and d/b/a Highmark Blue

Shield in central Pennsylvania and southeastern Pennsylvania and its subsidiaries and affiliated

companies in Pennsylvania are collectively referred to as "Highmark Blue Cross and Blue Shield

Pennsylvania" or "Highmark-PA" in this Complaint.  Highmark-PA exercises market dominance

as a Blue in Pennsylvania or within areas of Pennsylvania.  Through its own actions and through

its subsidiaries or affiliated companies, Highmark-PA has agreed to and participates in the

challenged conduct.

121.    **Highmark-WV**.  Defendant Highmark West Virginia Inc. d/b/a Highmark Blue

Cross Blue Shield West Virginia is a West Virginia company with its headquarters located at 700

Market Square, Parkersburg, West Virginia 26101.  It is a subsidiary of Defendant Highmark Health. Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia, formerly known as Mountain State Blue Cross Blue Shield, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in West Virginia.[3]  Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia and its subsidiaries and affiliated companies in West Virginia are collectively referred to as "Highmark Blue Cross Blue Shield West Virginia" or "Highmark-WV" in this Complaint. Highmark-WV exercises market dominance in West Virginia or within areas of West Virginia. Through its own actions and through its subsidiaries or affiliated companies, Highmark-WV has agreed to and participates in the challenged conduct.

### CC.    Horizon-NJ Defendant

122.    **Horizon-NJ**.  Defendant Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey is a New Jersey company with its headquarters located at Three Penn Plaza East, Newark, NJ 07105.  Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in New Jersey.  Horizon Healthcare Services, Inc. d/b/a Horizon Blue Cross Blue Shield of New Jersey and its subsidiaries and affiliated companies are collectively referred to as "Horizon Blue Cross and Blue Shield of New Jersey" or "Horizon-NJ" in this Complaint.  Horizon-NJ exercises market dominance as a Blue in New Jersey or within areas of New Jersey.  Through its own actions and through its subsidiaries or affiliated companies, Horizon-NJ has agreed to and participates in the challenged conduct.

---

[3]    Washington County, Ohio was part of Highmark-WV's Service Area until Highmark-WV requested, and BCBSA granted, its transfer to Anthem-OH in 2023.

### DD.    Independence-PA Defendant

123.    **Independence-PA**.  Defendant Independence Health Group, Inc. is a Pennsylvania company with its headquarters located at 1901 Market Street, Philadelphia, PA 19103.  It is the parent of Independence Hospital Indemnity Plan, Inc., f/k/a Independence Blue Cross, QCC Insurance Company, and Independence Assurance Company, and additional subsidiaries. Independence Health Group, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in areas within Pennsylvania. Independence Health Group, Inc. and its subsidiaries and affiliated companies, including Independence Hospital Indemnity Plan, Inc., f/k/a Independence Blue Cross, QCC Insurance Company, and Independence Assurance Company, are collectively referred to as "Independence-PA" in this Complaint.  Independence-PA exercises market dominance as a Blue in areas of Pennsylvania.  Through its own actions and through its subsidiaries or affiliated companies, Independence-PA has agreed to and participates in the challenged conduct.

### EE.    Premera Defendants

124.    **PREMERA**.  Defendant PREMERA is a Washington nonprofit company with its headquarters located 7001 220th St. SW, Mountlake Terrace, WA 98043.  It is the sole voting member of Defendant Premera Blue Cross, which is registered as a health care service contractor in Washington and a hospital and medical service corporation in Alaska.  PREMERA, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Alaska and Washington.  PREMERA and its subsidiaries and affiliated companies are collectively referred to as "Premera" in this Complaint.  Premera, through its subsidiaries and affiliated companies, exercises market dominance as a Blue in its states of operation (Alaska and Washington) or in areas within those states.  Through its own actions and through its subsidiaries, Premera has agreed to and participates in the challenged conduct.

125.    **Premera-AK**.  Defendant Premera Blue Cross Blue Shield of Alaska is a division of Defendant Premera Blue Cross, with its principal place of business located at 2550 Denali Street, Suite 1404, Anchorage, AK 99503.  Premera Blue Cross Blue Shield of Alaska, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Alaska.  Premera Blue Cross Blue Shield of Alaska and its subsidiaries and affiliated companies in Alaska are collectively referred to as "Premera-AK" in this Complaint.  Premera-AK exercises market dominance as a Blue in Alaska or within areas of Alaska.  Through its own actions and through its subsidiaries or affiliated companies, Premera-AK has agreed to and participates in the challenged conduct.

126.    **Premera-WA**.    Defendant Premera Blue Cross is Washington nonprofit corporation that is registered as a health care service contractor at 7001 220th St. SW, Mountlake Terrace, WA 98043.  Defendant PREMERA is the sole voting member of Premera Blue Cross. Premera Blue Cross, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Washington.  Premera Blue Cross and its subsidiaries and affiliated companies in Washington are collectively referred to as "Premera Blue Cross" or "Premera-WA" in this Complaint.  Premera-WA exercises market dominance as a Blue in Washington or within areas of Washington.  Through its own actions and through its subsidiaries or affiliated companies, Premera-WA has agreed to and participates in the challenged conduct.

**FF.    Prosano Defendants**

127.    **Prosano**.  Defendant Prosano, Inc. is an Arizona company with its headquarters located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021.  It is the parent of Blue Cross and Blue Shield of Arizona, Inc. Prosano, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Arizona.  Prosano, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Prosano" in this Complaint.

Prosano exercises market dominance as a Blue in Arizona or within areas of Arizona. Through its own actions and through its subsidiaries or affiliated companies, Prosano has agreed to and participates in the challenged conduct.

128. **Prosano-AZ**. Defendant Blue Cross and Blue Shield of Arizona, Inc. is an Arizona company with its headquarters located at 2444 West Las Palmaritas Drive, Phoenix, AZ 85021. Blue Cross and Blue Shield of Arizona, Inc., itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Arizona. Blue Cross and Blue Shield of Arizona, Inc. and its subsidiaries and affiliated companies in Arizona are collectively referred to as "Blue Cross and Blue Shield of Arizona" or "Prosano-AZ" in this Complaint. Prosano-AZ exercises market dominance as a Blue in Arizona or within areas of Arizona. Through its own actions and through its subsidiaries or affiliated companies, Prosano-AZ has agreed to and participates in the challenged conduct.

### GG.    USAble-AR Defendant

129. **USAble-AR**. Defendant USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and Blue Advantage Administrators of Arkansas is an Arkansas company with its headquarters located at 601 S. Gaines Street, Little Rock, Arkansas, 72201. USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and Blue Advantage Administrators of Arkansas, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Arkansas. It is the largest provider of health care insurance and administrative services for health care plans in Arkansas. USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and Blue Advantage Administrators of Arkansas and its subsidiaries and affiliated companies are collectively referred to as "Arkansas Blue Cross and Blue Shield" or "USAble-AR" in this Complaint. USAble-AR exercises market dominance as a Blue in Arkansas or within areas of Arkansas. Through its own

actions and through its subsidiaries or affiliated companies, USAble-AR has agreed to and participates in the challenged conduct.

### HH.    **Wellmark Defendants**

130.    **Wellmark**.  Defendant Wellmark, Inc. is an Iowa company with its headquarters located in Iowa.  The principal headquarters for Wellmark is located at 1331 Grand Avenue, Des Moines, IA 50306.  Wellmark, Inc. itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Iowa and South Dakota. Wellmark, Inc. and its subsidiaries and affiliated companies are collectively referred to as "Wellmark" in this Complaint.  Wellmark exercises market dominance as a Blue in Iowa and South Dakota or within areas of those states.  Through its own actions and through its subsidiaries or affiliated companies, Wellmark has agreed to and participates in the challenged conduct.

131.    **Wellmark-IA**.  Defendant Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa is an Iowa company with its headquarters located at 1331 Grand Avenue, Des Moines, IA 50306.  Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in Iowa.  Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa and its subsidiaries and affiliated companies in Iowa are collectively referred to as "Blue Cross and Blue Shield of Iowa" or "Wellmark-IA" in this Complaint.  Wellmark-IA exercises market dominance as a Blue in Iowa or within areas of Iowa.  Through its own actions and through its subsidiaries or affiliated companies, Wellmark-IA has agreed to and participates in the challenged conduct.

132.    **Wellmark-SD**.  Defendant Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota is a South Dakota company with its headquarters located at 1601 W. Madison, Sioux Falls, SD 57104.  Wellmark of South Dakota, Inc. d/b/a Wellmark

Blue Cross and Blue Shield of South Dakota is a subsidiary of Defendant Wellmark, Inc. Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota, itself or through its subsidiaries or affiliated companies, provides health insurance to subscribers to various health care plans in South Dakota. Wellmark of South Dakota, Inc. d/b/a Wellmark Blue Cross and Blue Shield of South Dakota and its subsidiaries and affiliated companies in South Dakota are collectively referred to as "Wellmark Blue Cross and Blue Shield of South Dakota" or "Wellmark-SD" in this Complaint. Wellmark-SD exercises market dominance as a Blue in South Dakota or within areas of South Dakota. Through its own actions and through its subsidiaries or affiliated companies, Wellmark-SD has agreed to and participates in the challenged conduct.

## FACTUAL ALLEGATIONS

### III.    THE RELATIONSHIP OF THE PARTIES

133.    Plaintiffs Boston Children's Hospital and its affiliates are not-for-profit providers of health care goods, services, and facilities where medical and surgical procedures are performed. Much of Plaintiffs' revenue comes from payments made by commercial health insurers, including the Defendant Blues. Plaintiffs submit claims for reimbursement for the medically necessary health care and other services, goods and facilities provided to the children who are their patients and who are covered through their parents by plans of insurance issued or administered by these commercial insurers. Reimbursements by these commercial insurers at fair amounts determined by the free market are essential to Plaintiffs' ability to continue to operate at the level necessary to provide the highest quality and essential cutting-edge health care goods, services, and facilities to insured and uninsured patients.

134.    Plaintiffs have each contracted with either Defendant Blue Cross and Blue Shield of Massachusetts or Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. or both. A significant portion of Plaintiffs' patients are covered by Blue Plans issued or administered locally

where the individual Plaintiffs provide health care goods, services, and facilities.[4]  However, a substantial portion of Plaintiffs' patients reside outside the Commonwealth of Massachusetts and are covered by Defendants other than BCBS-MA.  In a free market, Boston Children's Hospital would be able to leverage its unparalleled highest level of care for children to negotiate superior rates with the Defendants other than BCBS-MA.  But this competitive outcome is thwarted by the challenged conduct.

135.    BCBS-MA uses its market dominance in Massachusetts to negotiate lower levels of reimbursement than any other commercial provider doing business with Plaintiffs.  Due to the Defendants' anticompetitive conduct, including the "Blue Card" program, *all* the Defendants free-ride off these rates, and have no incentive to and will not negotiate free market rates with Plaintiffs. The Blue Defendants (other than BCBS-MA) achieve these lower reimbursement rates by riding the coattails of BCBS-MA, which itself has a greater market power than it would otherwise have because of the Defendants' anticompetitive conduct.  If each out-of-state Defendant Blue had to negotiate individually, and could not rely on the unchallenged market power of BCBS-MA or the collective group as a whole, each would pay a much higher level of reimbursements to Boston Children's Hospital.  Such higher reimbursements would then enable Boston Children's Hospital to treat more patients and invest in more innovative healthcare research.

136.    Throughout the Relevant Time Period, Plaintiffs have provided medically necessary covered goods, services, and facilities to patients covered by Blue Plans issued or administered by one or more of the Defendant Blues.  This Complaint refers to these patients at times as the Blues' subscribers.  Plaintiffs provided these medically necessary covered goods,

---

[4]    In this Complaint, "Blue Plan" refers to a Blue Cross and/or Blue Shield-branded health insurance plan issued and/or administered by a Blue.

services, and facilities pursuant to "in-network" or "participating" contracts with the Blues.[5] Plaintiffs then submitted claims for reimbursement for these goods, services, and facilities to BCBS-MA.

137.    Defendant Blues provide health insurance coverage or administrative services (collectively referred to in this Complaint as "health insurance") for over 115 million members, located in all fifty states, Washington D.C., Puerto Rico, and the U.S. Virgin Islands.  The Blues collectively operate the most extensive provider networks in the United States, with more than 1.7 million doctors and hospitals.  There are currently thirty-two companies with a Primary License Agreement with BCBSA ("Primary Licensees").  Each Primary Licensee may have ownership and/or control of one or more entities (a "Controlled Affiliate Licensee") that operates as a Blue. For example, Defendant Elevance Health, Inc. is a Primary Licensee of BCBSA and, through various subsidiaries, offers Blue Plans in fourteen states.  Each Primary Licensee is under separate ownership and control from the other Primary Licensees.

138.    Defendants have acknowledged during the Relevant Time Period  that they are separate legal and economic entities.  BCBSA has stated on its website that the Blues are "independent companies" that operate in "exclusive geographic areas."  The BCBSA License Agreements repeatedly emphasize the "independent nature of every licensee."  Defendant Anthem has publicly described the Blues during the Relevant Time Period as "independently owned and

---

[5]    Health care providers are either "in-network" or "out-of-network" with respect to insurance carriers.  "In-network" providers are those who contract with health insurers that require them to accept discounted, pre-negotiated rates as payment in full for covered goods, services, and facilities.  "Out-of-network" providers are those that do not have contracts with insurance carriers to accept pre-negotiated rates and instead, independently set their own fees for the health care and other services, goods and facilities that they deliver to their patients.

operated" and state that each is an "independent legal organization."  During the Relevant Time Period, the Blues have operated independently.

## IV.    THE BLUES' MARKET ALLOCATION SCHEME

139.    The Defendants have engaged in an unlawful Market Allocation Scheme that centers around each Blue agreeing to stick to its own turf and not meaningfully compete against any other Blue in any other territory.  The market does not need to be structured this way, and, if it were not, the Blues would compete against one another in an unrestrained market and the reimbursement rates for Boston Children's Hospital would be materially higher.

140.    The Blues' Market Allocation Scheme has four primary components, each of which is described in detail below: (1) the "License Agreements" between the BCBSA and each Blue; (2) the pretextual "Guidelines" and "Membership Standards" issued by the BCBSA; (3) the "Side Agreements" reached between and among the Blues; and (4) the "Blue Card" price-fixing schedule, which reinforces the anticompetitive nature of the Market Allocation Scheme.

141.    The Blues' Market Allocation Scheme has been spelled out in black-and-white in various BCBS business communications and documents during the Relevant Time Period. Specifically, under licenses from the BCBSA, each Blue has an ESA wherein that BCBS entity is assured that none of the other thirty-two Blue entities will meaningfully compete.  The collective group of Defendant Blues thereby overcharge subscribers (patients) while underpaying providers (such as Plaintiffs).  Everyone is harmed except the Blues.

142.    Indeed, the Market Allocation Scheme and their other anticompetitive conduct detailed herein has enriched the Defendant Blues, who have stockpiled billions of dollars in reserves during the Relevant Time Period (notwithstanding the supposed "non-profit" status of BCBS-MA and a number  of the others).  As of Sept. 30, 2010, thirty-three "not-for-profit" Blues held more than $27 billion in capital in excess of the minimum threshold reserves required by the

BCBSA.  BCBS-MA, for example, currently holds well over $2 billion in reserves, while paying its senior executives multi-million dollar salaries.

143.    BCBSA is a separate legal entity from the Blues that purports to promote the common interests of the Blues.  The BCBSA exists solely for the benefit of the Blues and to facilitate their concerted activities.  The BCBSA is funded through dues paid by the Blues.

144.    BCBSA has described itself as "a national association of 33 independent, community-based and locally operated Blue Cross Blue Shield companies."  BCBSA has further stated that it "grants licenses to independent companies to use the trademarks and names in exclusive geographic areas."  In actuality, BCBSA serves as a pretextual hub used to effectuate the Blues' illicit communications and arrangements in furtherance of the challenged conduct.

145.    Every Blue Defendant is required to be a member of BCBSA in order to use the Blue Cross Blue Shield trademark and license.  Each Blue (or its parent) has a representative on the BCBSA Board of Directors.  The Blues' representatives (typically CEOs of the Blues) have continuously controlled BCBSA's Board of Directors from its inception long before the Relevant Time Period  through the present.  Blue representatives also participate in numerous BCBSA Committees.  BCBSA is entirely controlled by its Primary Licensee members, all of whom are the independent, separately owned health insurance companies that license the Blue Cross and/or Blue Shield trademarks and trade names and are named as the Defendants herein.

146.    BCBSA meetings provide a forum for Defendants to share among themselves confidential, competitively sensitive information regarding specific health insurance issues common to the Blues, including reimbursement data provided by Plaintiffs and others.  BCBSA includes numerous committees governed by the Blues; it sponsors various closed-door meetings, seminars, and conferences that the Blues attend.  These activities are used to further the challenged

conduct to reduce or eliminate competition in contracting with Plaintiffs and other health care providers.

147.    Defendants' anticompetitive agreements include express written agreements executed through the pretext of the BCBSA and informal agreements between certain of the Blues not to compete in each other's ESAs even where competition is nominally permitted under BCBSA rules.

148.    None of the Blues has or had any franchise agreement with any other Blue.  No Blue has any franchise agreement with BCBSA.  Each Blue has its own sales, revenue, and expenses, makes its own profits and losses, and acts for the benefit of its own shareholders or stakeholders.  As the largest Blue, Anthem, now Elevance, stated in a trial brief filed during the Relevant Time Period with the United States District Court for the District of Columbia, "the various Blues are not a single firm; notwithstanding their participation in the BCBSA, they are separate firms that at times compete with one another and that at all times separately seek to maximize their own profits."  *United States v. Anthem, Inc.*, No. 16-cv-1493, Doc. No. 324 at 10 (D.D.C. Nov. 10, 2016).

### A.    License Agreements

149.    The first component of the Market Allocation Scheme is the "License Agreement" between each Blue and the BCBSA.  These are "License Agreements" in name only, as they are intended to restrict, and have restricted, competition among the Blues.  As described above, BCBSA is entirely owned and controlled by the Blues.  The Blue Cross License Agreement creates the ESAs, providing:

> The rights hereby granted are ***exclusive to the Plan within the geographical area(s)*** served by the Plan on June 30, 1972, and/or as to which the Plan has been granted a subsequent license, which is hereby defined as the 'Service Area,' except that BCBSA reserves the right to use the Licensed Marks in said Service Area, and except to the extent that said Service Area may overlap areas served by one or more

other licensed Blue Cross Plans as of said date or subsequent license, as to which overlapping areas the rights hereby granted are nonexclusive as to such other Plan or Plans only.

150.    The Blue Shield License Agreement contains identical language.  Nearly all the Blues' "Service Areas" do not overlap.  In other words, they are exclusive.  The License Agreements thus amount to a blatant allocation of exclusive territories carved out among horizontal competitors who agree not to compete in each other's ESAs.

151.    As a key component of the Market Allocation Scheme, the License Agreements also contain a provision pursuant to which each Blue agrees that neither it nor its subsidiaries (referred to as "Controlled Affiliates") will compete by operating Blue-branded health insurance plans outside of its designated ESA: "[T]he Plan may not use the Licensed Marks and Name outside the Service Area or in connection with other goods and services. . . . In addition to any and all remedies available hereunder, BCBSA may impose monetary fines on the Plan for the Plan's use of the Licensed Marks and Names outside the Service Area."  Further, the License Agreements state that BCBSA "will not grant any other license effective during the term of this License Agreement for the use of the Licensed Marks or Name which is inconsistent with the rights granted to the Plan hereunder . . . ."

152.    Thus, under the License Agreement, each Blue has the exclusive right to sell Blue-branded health insurance and negotiate contracts with health care providers, including Plaintiffs, within its ESA.

153.    In a competitive market, Plaintiffs and other health care providers could contract directly with non-local Blues for Blue-branded insurance and, if given the opportunity, they would do so.  However, due to their unlawful agreements, Plaintiffs do not have these options, and many Plaintiffs have faced or feared retaliation from the BCBSA or other Blues if they sought to do so.

154. The Blues have used these ESA restrictions to refuse to enter into, or even engage in conversations regarding, direct contracts with health care providers outside of their ESAs or contiguous counties. For Plaintiffs here, the percentage of patients with non-local Blue-branded commercial health insurance (*i.e.*, patients treated pursuant to the BlueCard Program and/or National Accounts Program) is significant relative to patients with local-Blue branded commercial insurance. Non-local Blues have no incentive to and will not negotiate with Plaintiffs given the scheme.

155. Boston Children's Hospital has been particularly hurt by Defendants' market allocation scheme and other anticompetitive conduct such as the BlueCard program. Boston Children's Hospital attracts parents and their children from all across the United States and beyond. Almost half of Boston Children's Hospital revenue comes from the provision of health care and other services to children and their parents who live outside the Commonwealth of Massachusetts and/or are covered by Blues other than BCBS-MA. However, no matter where the patient resides or which Blue plan covers him or her, Boston Children's Hospital can submit its claims for reimbursement only to BCBS-MA, which sets the rates at which Boston Children's Hospital is paid. Boston Children's Hospital cannot as a practical matter negotiate higher rates with other Blues because, given Defendants' anticompetitive conduct, the other Blues have no economic incentive to negotiate outside their ESAs. And BCBS-MA has enormous leverage and power over Boston Children's Hospital, since the territory allocation scheme has endowed BCBS-MA with enormous (albeit artificially created) market power in Massachusetts given its large share of patient subscribers. If Boston Children's Hospital were to refuse BCBS-MA's anticompetitive rates, the other Blues would refuse to do business with them. As a result of Defendants' unlawful market allocation scheme and other anticompetitive conduct, Boston Children's Hospital is routinely

reimbursed at rates that are at least 15-20 percent or more below the rates of other national insurers like United, Cigna and Aetna.

156.    The License Agreements and thus Defendants' anticompetitive conduct have not changed in any material respect and are not expected to change, given that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans."  BCBSA has described the provisions of the License Agreements as something the member plans together "deliberately chose," and "agreed to."

157.    The License Agreements are not equivalent to the individual enforcement of common-law trademark rights, which give the trademark holder the right to *exclude* others from using the mark in a given territory.  Defendants have instead used the License Agreements to collectively promise not to compete outside each Blue's own territory against other Blues, *i.e.*, outside their respective ESA's.  There is no common-law trademark right to form an agreement among competitors not to intrude into each competitor's exclusive territory and not to compete. Simply put, the Blues have used their control of BCBSA to secretly agree collectively to give up their individual decision-making with respect to enforcing or not enforcing any individual trademark rights that a Blue may have held.

158.    Although the License Agreements purport to be vertical agreements by which independent insurance entities license the Blue Cross and/or Blue Shield marks, the License Agreements are in actuality horizontal market allocation agreements among competitors to divide and allocate geographic markets for selling health insurance and purchasing health care and other services, goods and facilities from Plaintiffs and other health care providers.  The License Agreements exist for the purpose of reducing competition and decreasing the amounts paid to Plaintiffs and other health care providers.  To the extent Defendants assert that the License

Agreements are legitimate, arm's-length agreements regarding trademark and trade name enforcement, the use of BCBSA to implement the License Agreements is instead a pretextual sham to create and enforce Defendants' Market Allocation Scheme and other anticompetitive conduct.

159.    The License Agreements' creation of ESAs is not necessary for the "Blue System" to function.  In a competitive, well-functioning market, the Blues would compete against one another as independent healthcare payors.  There is no procompetitive justification for dividing up geographical territory and agreeing not to compete.  The Blues have maintained the inflexibility of these ESAs despite numerous requests by Boston Children's Hospital to be able to negotiate with Blues other than BCBS-MA.

160.    Defendants also do not need the anticompetitive agreements described above to identify the source of any trademarked purchasers of health care and other services, goods and facilities or to avoid confusion among health care providers or others.  BCBSA has acknowledged that overlapping service areas do not cause confusion.  In fact, in 2001, the President and CEO of Blue Cross and Blue Shield of Western New York stated that the Blue brands "are strengthened in overlapping service areas where two Plans are able to compete freely."  There are also significantly less-restrictive means to eliminate any potential confusion, such as requiring that each Blue use its actual name (in whole or in part) to identify the source of the goods,  health care and other services, and facilities.  For example, parts of Washington include geographic territory in which two Blues—Defendants Premera-WA and Regence-WA—are permitted to operate and do so without apparent confusion among plan subscribers or health care providers.  The same is true in California.

161.    Two examples illustrate how the Blues have selectively chosen to permit Blue-on-Blue competition to avoid a court decision about whether the Blues' ESAs violate the antitrust laws—demonstrating that such competition is possible.

162.    **Ohio**.    In 1985, four Blues operated in Ohio: Community Mutual Insurance Company ("Community Mutual"), based in Cincinnati; Blue Cross and Blue Shield Mutual of Northern Ohio, based in Cleveland; Blue Cross of Northwest Ohio, based in Toledo; and Blue Cross of Central Ohio, based in Columbus.

163.    In September 1985, BCBSA filed a federal trademark infringement action against Community Mutual to enforce the Market Allocation Scheme, alleging that Community Mutual was operating in areas of Ohio outside its ESA.  BCBSA's motion for a preliminary injunction was denied.  *In re Blue Cross Blue Shield Antitrust Litigation*, 2:13-cv-20000, Doc. 1429-9 at 21 (N.D. Ala. Aug. 8, 2017).  Thereafter, the Ohio-based Blues began competing throughout Ohio using the blue trademarks, resulting in competition among multiple Blue Cross  and  Blue Shield licensees.  *Id.* ("The Attorney General [of Ohio] sought and was granted the right to intervene as a party defendant in the action, and asserted in the counterclaim that the BCBSA system allocating exclusive service areas violates the antitrust laws. Since that time . . . [the Blue licensees have] marketed health care insurance and prepaid benefits using the BLUE CROSS and/or BLUE SHIELD names and marks in areas . . . outside of their respective licensed service areas.").  But the competition did not last.

164.    Instead, in 1986, Blue Cross of Northwest Ohio merged with Blue Cross and Blue Shield Mutual of Northern Ohio, taking the name Blue Cross and Blue Shield of Ohio.  Ten years later Blue Cross and Blue Shield of Ohio proposed selling its assets and license to use the Blue Marks to Columbia/HCA, a non-Blue company that operated a number of hospitals. BCBSA

refused, revoked Blue Cross and Blue Shield of Ohio's license, and transferred the license to Anthem. As such, by 1997, what remained of the competition among the Ohio Blues had ended due to the Blues' concerted action through BCBSA.

165. **Maryland**. As of 1984, BCBSA had divided Maryland between two Blues: Group Hospitalization and Medical Services, Inc. ("GHMSI") operated in two suburban counties of Washington, D.C., while Blue Cross and Blue Shield of Maryland, Inc. operated in the remainder of Maryland.

166. That year, the State of Maryland sued BCBSA, Blue Cross and Blue Shield of Maryland, Inc., and GHMSI in federal court, alleging—as alleged here—that their agreement to allocate territories violated Section 1 of the Sherman Act. *See Maryland v. Blue Cross & Blue Shield Ass'n*, 620 F. Supp. 907 (D. Md. 1985). During discovery, Blue Cross and Blue Shield of Maryland, Inc. offered testimony that its CEO refused to allow the marketing department to engage in marketing activities across the boundary separating it from GHMSI's territory because that was prohibited by its agreement with BCBSA.

167. Shortly before a ruling on the legal standard on which the case should be tried, the defendant Blues settled, and BCBSA allowed the Maryland Blues to compete throughout the state of Maryland for a time. Describing the settlement, Maryland's Attorney General stated, "The settlement promotes the purpose of the antitrust laws by ensuring that the business decisions of potential competitors are made independently and without regard to artificial marketing barriers."

168. As in Ohio, competition was not fatal in Maryland. Nor did it last long. In 1993, the Superintendent of Insurance of the District of Columbia reported to the Senate Permanent Subcommittee on Investigations that GHMSI's core business was profitable in 1992. Blue Cross and Blue Shield of Maryland, Inc. reported in 1992 that it had been profitable for the previous

three years.  GHMSI and Blue Cross and Blue Shield of Maryland, Inc. both continued to exist until they merged in 1998 to become Defendant CareFirst.  The Blues' experience in Maryland again demonstrates that healthy competition among the Blues could exist but for the territory allocation scheme.  Unfortunately, that competition ceased to exist with the creation of defendant CareFirst, which has engaged in the same anticompetitive conduct as the other Defendant Blues.

169.    Each Blue Defendant has entered into a License Agreement with BCBSA.  The use of the License Agreements to reduce or eliminate competition has injured, and continues to injure, Plaintiffs and are a part of the Market Allocation Scheme.

### B.    Guidelines and Membership Standards: The Best Efforts Rules

170.    The second set of Defendants' anticompetitive agreements relevant to the Market Allocation Scheme are the BCBSA Guidelines to Administer Membership Standards ("Guidelines") and Membership Standards Applicable to Regular Members ("Membership Standards").  Under the Guidelines and Membership Standards, the Blues agreed, through the pretext of BCBSA, that at least two-thirds of the annual revenue—*i.e.*, revenue from both inside and outside of its ESA—from commercial insurance generated by each Blue or its subsidiaries (as defined by BCBSA rules) must be attributable to Blue-branded health insurance plans. Alternatively, the Guidelines allow national enrollment to be substituted for annual revenue, meaning a Blue may derive no less than two-thirds of its national enrollment from its Blue business.  These agreements have been described by the Blues as the "National Best Efforts" rule. They were adopted in 2005, renewed in 2015, and purportedly terminated in April 2021 in connection with Defendants' settlement of a class action antitrust lawsuit brought on behalf of insurance subscribers.

171.    Before the enactment of the National Best Efforts rule, counsel for Anthem's predecessor described his concern with the legal implications of limiting the growth of non-Blue

brands, expressing "***significant doubt whether, under the antitrust laws, an association like BCBSA could lawfully bar members from engaging in unbranded business outside their exclusive territories***." *In re Blue Cross Blue Shield Antitrust Litigation*, 2:13-cv-20000, Doc. 1555-1 at 7 (N.D. Ala. Sep. 15, 2017) (emphasis added).

172.    The National Best Efforts rule is, and always has been, a naked output restriction. It was intended to and has limited each Blue's ability both to generate revenue from non-Blue branded business and to develop or acquire non-Blue health insurance companies that compete with the Blues.

173.    The limitations that the National Best Efforts rule has imposed on Blues engaging in non-Blue branded business has created a disincentive for a Blue to contract within an ESA with health care providers using a non-Blue branded plan, and—of particular relevance to the Market Allocation Scheme—a disincentive for a Blue to contract with health care providers outside of its ESA for the purpose of supplying health care and other services, goods and facilities to subscribers of non-Blue branded insurance plans also owned or controlled by the Blue.

174.    By means of their membership in BCBSA, each Blue agreed to comply with, and did in fact comply with, the National Best Efforts rule.  These agreements have been a part of the Market Allocation Scheme and operated to limit the number of commercial insurers who purchase health care and other services, goods and facilities from, and reduce or eliminate competition for contracts with, Plaintiffs and other health care providers.  And despite the Blues' agreement supposedly to end the National Best Efforts rule as part of their 2021 settlement of antitrust claims brought by a national class of Blue Plan subscribers, the effects of the National Best Efforts rule have continued to cause artificially low reimbursement rates to Plaintiffs.

175.    In addition to the National Best Efforts rule, under the Guidelines and Membership Standards, each Blue has also agreed that at least 80% of the annual revenue (as defined by BCBSA rules) that it or its subsidiaries generate from commercial insurance within its ESA must be derived from services offered under the licensed Blue Cross and/or Blue Shield trademarks and trade names.  These agreements have been described by the Blues as the "Local Best Efforts" rule.  The Local Best Efforts rule was adopted in 1994.  Like the National Best Efforts rule, these agreements are also output restrictions that limit the number of commercial insurers who purchase health care and other services, goods and facilities from, and eliminates or reduces competition for contracts with, Plaintiffs and other health care providers.  Unlike the National Best Efforts rule, the Local Best Efforts rule has not been terminated.  To the contrary, according to Elevance Health, Inc.'s 2023 Form 10-K, Anthem-CA is required to have "substantially all" of its annual combined local net revenue be attributable to health care plans and related services "sold, marketed, administered or underwritten under the BCBS names and marks."

176.    Like the National Best Efforts Rule, Defendants' executives have long expressed skepticism and concern about the anticompetitive implications of the output-limiting Local Best Efforts rule.  For instance, in, 1994, the CEO of BCBS Wisconsin sent a concerned letter to the president of the BCBSA warning against the adoption of the Local Best Efforts Rule, writing:

> ***I am very concerned about the antitrust implications of the Best Efforts Standard and the interpretive guidelines***. You are well aware that BCBSA's exclusive territorial licensing of its service marks is potentially subject to antitrust scrutiny. The imposition of additional restrictions, even under the guise of an attempt to secure a licensee's "best efforts" to promote the service marks, might be considered an unreasonable additional restraint on a licensee under Section 1 of the Sherman Act. . . . The requirement imposed by the Standard and the interpretive guideline, that 80% of the Plan's licensable services in its designated service area be marketed under the licensed marks by January 1, 1999, could be deemed an unreasonable restriction, even if it is arguably directed at obtaining a Plan's best efforts at promoting the licensed marks.

*In Re Blue Cross Blue Shield Antitrust Litigation*, 2:13-cv-20000, Doc. 1352-219 at 3 (N.D. Ala. July 7, 2017) (emphasis added).

### C.    Side Agreements

177.    In addition to the agreements addressed above, certain Blues have at times entered into additional side agreements not to compete in geographic areas even where limited competition is ostensibly permitted by BCBSA.

178.    Each Blue could (if it wished) contract with health care providers such as Plaintiffs located one county into a contiguous or adjacent Blue's ESA, in certain circumstances and for certain types of patients, without violating the BCBSA License Agreements.  Each Blue has an economic incentive to do so where, for example, a major city is located immediately across a state border.  Yet many of the Blues have entered into side agreements not to compete in counties adjacent to their borders.  For example, in Missouri, Defendant HCSC-IL had refused to enter into contracts with health care facilities located in St. Louis, Missouri (which sits on the border of Missouri and Illinois) because it and Defendant Anthem-MO had a side agreement not to compete in contiguous counties in each other's ESAs, despite nominally being allowed to do so under BCBSA's Licensing Agreements.  And BCBS-MA has refused to compete with, for example, the Defendant Blues in Providence Rhode Island and Manchester, New Hampshire.

179.    These "side agreements" are part of the Market Allocation Scheme, which operated and continues to operate to limit the number of commercial insurers who purchase health care and other services, goods and facilities from Plaintiffs as well as to reduce or eliminate competition for contracts with Plaintiffs.

180.    In October 2024, Defendants entered into a settlement agreement with a putative class of health care provider plaintiffs with antitrust claims pending in the MDL Litigation.  In the settlement agreement, Defendants agreed to a number of structural changes to contiguous area

provider contracting and other BCBSA requirements.  Although Defendants disclaimed liability for antitrust violations, Defendants' agreement to such structural changes illustrates the prior competitive harm of Defendants' agreements and conduct.

### D.    BlueCard Program

181.    The BlueCard Program is another of the Defendants' artifices designed to reinforce and strengthen the Market Allocation Scheme.  Defendants developed the BlueCard Program in the 1990s, and it has been in effect during the entirety of the Relevant Time Period.  The BlueCard Program is one of BCBSA's Inter-Plan Programs, and requires, by agreement of all Defendants, that every Blue must participate.

182.    The BlueCard Program is the means by which the Blues process claims by health care providers (such as Plaintiffs) operating in a given ESA for a patient whose Blue Plan is based in another ESA.  Defendants refer to the Blue that has the subscriber as the "Home Plan."  The Blue located in the ESA where the health care and other services, goods and facilities are provided to the patient is referred to as the "Host Plan."

183.    The BlueCard Program amounts to yet another anticompetitive agreement among the Blue entities.  That is because the BlueCard Program secures for the Blue Defendants outside Massachusetts the same low rates negotiated by BCBS-MA despite the fact that if the Blue Defendants outside Massachusetts agreed to negotiate with Plaintiffs as individual entities, the reimbursement rates paid to Plaintiffs would be far higher given the lower volume and market power of these non-Massachusetts providers.  And on top of that, BCBS-MA would not have the market power it does if the Blue Defendants outside Massachusetts were willing to compete with it.  This scheme blocks Plaintiffs' ability to, as a practical matter, negotiate reimbursement rates with any Blue entity other than BCBS-MA, as each of those Blue entities free-rides off the rates Boston Children's Hospital is able to negotiate with BCBS-MA.

184.    Through the BlueCard Program, the Blues have agreed that when a patient receives treatment from a contracted health care provider outside the Home Plan's ESA (*i.e.*, in the Host Plan's ESA), the Home Plan will reimburse the health care provider through the Host Plan at a predetermined and agreed-upon rate—virtually always, the rate contained in the provider's contract with the Host Plan.

185.    The BlueCard Program constitutes blatant price fixing and further facilitates the Market Allocation Scheme.

186.    The Blue entities other than the Host Entity have no economic incentive to negotiate deals with providers like Boston Children's Hospital, because those entities secure better economic terms by free-riding off BCBS-MA's artificial, unlawfully obtained monopsony power in Massachusetts.  In this way, the Blue Card system reinforces the underlying Market Allocation Scheme by thwarting any incentive to compete on price between and among the Blues, and fixes prices by limiting Plaintiffs' reimbursement to BCBS-MA's rates, no matter where the patient and his/her service plan is located.

187.    The Defendants have touted  the repeal of the "National Best Efforts" rule as a procompetitive development, but the BlueCard Program completely undermines that potential reform.  While the supposed repeal of the National Best Efforts rule may have created an incentive for other Blues to compete in Massachusetts in a vacuum, the BlueCard Program completely thwarts that incentive.  A potential rival like Anthem is better off just free-riding off BCBS-MA's terms and prices rather than negotiating a separate deal with Boston Children's Hospital.  As evidence of this, no individual Blue other than BCBS-MA has contacted Boston Children's Hospital to secure a potential deal or to negotiate since the National Best Effort's supposed repeal.

188. Standing alone, the BlueCard Program is price fixing. But it is also one of the tools the Blues use in furtherance of the Market Allocation Scheme. In the absence of the BlueCard Program, out-of-state Blue entities would have an economic incentive to compete against BCBS-MA in Massachusetts. But that incentive is eliminated by the BlueCard Program, because it is much easier—and more profitable—to simply free-ride off the negotiated BCBS-MA rates.

189. Plaintiffs are effectively required to participate in the BlueCard Program as a condition of their contracting with their local Blue. This harms Plaintiffs not only with respect to the rates they are paid, but also with respect to the entire reimbursement process. For example, to obtain reimbursement of a claim through the BlueCard Program, Plaintiffs must comply with the claim processing and appeal requirements of the dozens of other Home Plans throughout the United States. In general, Plaintiffs must (i) submit a claim to the Host Plan, BCBS-MA, (ii) wait for the claim to be transmitted to and processed by the Home Plan, (iii) comply with the particular rules and conditions of the Home plan for reimbursement, and (iv) be reimbursed at the Host Plan's artificially low rates.

190. Moreover, because the Blue Card program results in the application of the ***Home Plan***'s rules and conditions, negotiated benefits with the ***Host Plan*** do not apply. This undermines the value that Plaintiffs negotiate for with BCBS-MA, and allows the Home Plan to cherry-pick the contractual terms with which it will abide. The Home Plan gets the decreased rates enjoyed by the Host Plan, BCBS-MA, while maintaining the Home plan's own rules and regulations around claim processing and payment.

191. The BlueCard Program thus predictably creates inefficiencies exactly like the game of "telephone." Communication takes longer. Information is misunderstood or lost. And there is no way for Plaintiffs to pinpoint where each breakdown occurred.

192.    The Defendants also create pretextual excuses to delay or reject payment.  For example, out-of-state Home Plans sometimes provide pre-authorization for a certain type of procedure, say a kidney repair, but when the doctor opens the patient up, it turns out there is a related issue in the patient's stomach.  The doctor will conduct both procedures (kidney and stomach), and the Home Plan will deny the claim because pre-authorization was only granted for the kidney procedure.  The Home Plan then instructs Plaintiffs that they can only respond to the denial after forty-five days, introducing significant delay and financial issues.  In a competitive market, the Defendants would have to compete more vigorously on quality and such issues would either be eliminated or materially decrease.

193.    At times, Home Plans take different positions on coverage of particular procedures than the Host Plan like BCBS-MA does.  So, for example, a Host Plan Blue may approve of certain health care services for its own subscribers, but the Home Plan Blue may deem the same services "experimental" or "not medically necessary" such as whether a specific x-ray procedure must be used instead of an MRI, or the length of time a patient may stay in one type of facility before being transitioned to another type of facility.  For the Blues, the ambiguities and inconsistencies inherent in the BlueCard Program are oftentimes a benefit, because they provide a way for Home Plan Blues to deny or further under-reimburse health care providers like Boston Children's Hospital for otherwise legitimate claims, and to do so in a manner where they cannot be held accountable by the health care providers because they have no direct contractual relationship with them.

194.    During the Relevant Time Period, Plaintiffs estimate that they have collectively submitted hundreds of thousands, if not millions, of claims through the BlueCard Program.  Plaintiffs have collectively thereby transacted indirectly with all Blue Defendants.  To do so, Plaintiffs have been forced to comply with a myriad of different "Home Blue" reimbursement

policies in a time-consuming and inefficient manner, without the ability to contract directly with any Blue other than the local Host Plan Blue, *i.e.* BCBS-MA. Plaintiffs are often provided no explanation beyond an ambiguous denial code for why a Home Plan Blue is denying claims or reducing reimbursements. Plaintiffs also drain administrative resources and incur time delays to merely check the status of claim and appeal submissions—all so that Defendants can carry out their anticompetitive schemes using as one device the Blue Card Program. This anticompetitive conduct has continued unabated for years.

195.    The bottom line is that Home Plan Blues often leverage the complexity, lack of transparency and the lack of communication created by the BlueCard Program to intentionally and unjustifiably deny a relatively high percentage of reimbursement claims, delay payments, and under-reimburse health care providers, who have no ability to even try to hold them accountable for their actions. A health care provider's contract states that it must participate according to certain specified BlueCard Program rules, but those rules are not provided or clearly communicated to the providers like Boston Children's Hospital.

196.    Home Plan Blues often also have time limitation requirements that differ from Host Plan Blues for notices of admission, claim filing, claim resubmission, and appeals, which have left Plaintiffs without adequate information from which they can structure processes and procedures to effectively meet deadlines.

197.    As a result, in addition to receiving artificially low reimbursement rates through the BlueCard Program as well as encountering all of the logistical and communication issues outlined above, Plaintiffs have also suffered materially higher administrative costs and levels of claim denials, as well as significantly more underpaid claims and delays in receiving reimbursements than with their other insurers. Indeed, it takes up to approximately three times as long for Plaintiffs

to receive reimbursement for a claim submitted to Home Plans other than BCBS-MA under the BlueCard Program.   Plaintiffs are also reimbursed by other national insurers significantly faster than Home Plans.

## V.    THE DEFENDANT BLUES' BOYCOTT CONSPIRACY

198.    In addition to the Market Allocation Scheme and Price Fixing Conspiracies, the Defendant Blues have agreed with each other to boycott providers outside their ESAs (hereinafter the "Boycott Conspiracy").

199.    The Defendants have all agreed to the Boycott Conspiracy by committing to participate in the BlueCard and National Account Programs, among others.  The Defendants have implemented the Boycott Conspiracy through such artifices as the Inter-Plan Programs Committee ("IPPC") where Defendants decide how the BlueCard Program along with other national programs are designed and implemented.

200.    Pursuant to the Boycott Conspiracy, when Boston Children's Hospital provides healthcare or other services, goods or facilities to a patient who is insured by or is in a healthcare plan administered by one of the out-of-state Blue entities, the out-of-state Blue entity providing the health insurance lacks any incentive to, and therefore will not, negotiate a free market rate with Boston Children's Hospital, resulting in artificially suppressed reimbursement rates below what would be the case in a free, fair and competitive market.

201.    Through the national programs the Defendant Blues control more than 115 million patients, something no other health insurance company comes close to.  Nearly one-half the subscribers whose patients are treated by Boston Children's Hospital are subscribers with Defendant Blues other than BCBS-MA.  Yet Boston Children's Hospital can as a practical matter negotiate rates only with BCBS-MA for these subscribers because of Defendants' Boycott Conspiracy and other anticompetitive conduct.  As a result, Defendants have been able to depress

their payments to Boston Children's Hospital by substantial amounts each and every year in the Relevant Time Period.

## VI.    OTHER ANTICOMPETITIVE CONDUCT

202.    While Defendants have engaged in a blatantly illegal Market Allocation Scheme and Boycott Conspiracy as outlined above, they have reinforced their anticompetitive conduct through a variety of other unlawful acts that have cemented their market power and caused further anticompetitive effects.

### A.    The National Accounts Program

203.    The National Accounts Program is another of BCBSA's Inter-Plan Programs.  The National Accounts Program is an agreement by which the Blues have divided up, and agreed not to compete for, national and multi-state employee benefit plans.  Under the Blues' License Agreements, BCBSA rules, or both, the Blues have agreed that only one Blue may bid for and administer a National Account.  This Blue is known as the "Control Plan."  The Blues' License Agreements state that "The Control Plan of a National Account is the Plan in whose Service Area the National Account is located."  The other Blues in whose ESAs the Control Plan's patient-subscribers receive health care and other services, goods and facilities are known as the "Participating Plans."  Only the designated Control Plan is permitted to bid on a National Account using a Blue-branded plan.  Thus, "no two Blue companies will ever bid on the same large group or national account, and no Blue licensee may bid on an account headquartered in another licensee's state without receiving a 'cede' from that carrier."  *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 189 (D.D.C. 2017), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017).

204.    Absent the National Account Program, the Blues would compete for National Accounts headquartered outside of their ESAs.  For example, executives at Defendant Anthem have indicated that they would like to compete for National Accounts in all fifty states.  Defendant

Blue Cross Blue Shield of Alabama has directly asked other Blues to "cede" the right to bid on certain National Accounts, indicating a desire to win business outside of its ESA.  Such ceding seldom occurs.  As a result, each Control Plan will not contract directly with health care providers like Boston Children's Hospital outside of its ESA.  Instead, when health care providers are reimbursed for health care and other services, goods and facilities provided to a national subscriber of a Control Plan based in another ESA, the Blues have agreed that the health care providers are reimbursed at the Participating Plan's artificially low reimbursement rates—by default, the License Agreements state that the BlueCard Program's rules apply.  Accordingly, when Boston Children's Hospital provides health care or other services, goods and facilities to a patient covered by a national or multi-state benefit plan in another Blues' ESA, Boston Children's Hospital is reimbursed by the Participating Plan's artificially lower rates.

205.    The National Accounts Program creates an additional disincentive for non-local Blues to contract with Plaintiffs.  It has operated to limit the number of commercial insurers who purchase health care goods, services, and facilities from Plaintiffs, and to reduce or eliminate competition for contracts with Plaintiffs.  This results in artificially low reimbursement rates and output for Plaintiffs.

206.    Defendants have used an entity known as National Account Service Company L.L.C. ("NASCO") to facilitate the National Accounts Program.  Per its own marketing brochure, NASCO works with the Blues to "ensure their compliance with Blue Cross and Blue Shield Association (BCBSA) mandates."

207.    Changes to the National Accounts Program pursuant to the MDL Litigation's subscriber class settlement were approved on August 9, 2022, which allow certain employers with over 5,000 employees to solicit a bid from a second Blue plan, but these changes have not reduced

the harmful effects of these agreements on Plaintiffs. Indeed, the National Accounts Program continues to artificially limit the number of commercial insurers who purchase health care and other services, goods and facilities from Plaintiffs, thereby eliminating competition in the manner described above.

208.    The BlueCard Program and National Accounts Program are horizontal agreements among the Blues formed through the pretext of BCBSA. The BlueCard Program and National Accounts Program provide the Blues who are located outside the Commonwealth of Massachusetts with a pretextual reason not to negotiate contracts or reimbursement rates and terms with Plaintiffs. The BlueCard Program and National Accounts Program also impose on Boston Children's Hospital significantly increased administrative burdens, claims denials and underpayments, and delayed payments that would not otherwise exist.

### B.    Blue Health Intelligence

209.    The Blues also have agreements in place to share with each other (but not with Plaintiffs or any other providers) various confidential reimbursement payment data and other competitively-sensitive information. For this purpose, an entity named Blue Health Intelligence ("BHI") acts as a licensee of BCBSA, and is managed by a "Board of Managers" comprised entirely of Defendants' executives. During the relevant time period, BHI acquired Intelimedix, which licenses a claims database that holds the in-network pricing data from the Blue Defendants of more than 115 million insureds.

210.    BHI uses this confidential claims data, which is held in what is known as the BCBSA National Data Warehouse Core, to perform analytic reports for Defendants, making BHI an important conduit for the Blues to share otherwise confidential claims data. On information and belief, Defendants have used this data to monitor the contracting activities of other Blues and thereby reduce reimbursements rates paid to Plaintiffs.

211.    In addition to sharing Plaintiffs' and other health care providers' confidential claims information through BHI, several of the Defendants, including BCBS-MA, also do so through Consortium Health Plans, Inc. ("CHP").[6]  CHP has described itself as a "national coalition of 21 leading BCBS Plans, [which] provides a clear and unified voice, as well as effective central coordination, for the Blue System among national accounts . . . ." and "help[s] its founding Blue Cross Blue Shield Plans position themselves as the preferred choice for national accounts."

212.    In a 2013 marketing brochure for one of its data tools called ValueQuest, CHP stated:

> ValueQuest is Blue Cross Blue Shield's leading-edge analytical platform for measuring total health plan value. ValueQuest incorporates sophisticated data analytics with relevant industry benchmarks, new advances in measurement around cost, access to care, and lifestyle and behavioral characteristics. ValueQuest has the ability to compare each carrier's per-member, per-month (PMPM) cost in markets where employees reside.

The brochure further explains that "[t]he ValueQuest data set contains claims and membership data for BCBS nationally.  The data is pulled from Blue Health Intelligence (BHI) as well as directly from BCBS Plans."  CHP collected and made available to the Blue Defendants extensive, competitively sensitive data regarding Plaintiffs and other health care providers.  On information

---

[6]  Member Plans of CHP include Defendants Anthem Blue Cross and Blue Shield, Arkansas Blue Cross Blue Shield, Blue Cross Blue Shield of Alabama, Blue Cross Blue Shield of Michigan, Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of North Carolina, Blue Cross Blue Shield of Rhode Island, BlueCross BlueShield of Vermont (via affiliation with Blue Cross Blue Shield of Michigan), Blue Cross of Idaho, Blue Shield of California, Cambia Health Solutions, Capital Blue Cross, CareFirst Blue Cross Blue Shield, Florida Blue, Health Care Service Corporation, Highmark, Horizon Blue Cross Blue Shield of New Jersey, Independence Blue Cross, Premera, Wellmark and as noted, BCBS-MA.

and belief, BCBS-MA has used this data to monitor the contracting activities of other Blues in

under to lower reimbursements rates paid to Plaintiffs.

213.    The Blue Defendants have used BHI and CHP to fix prices all throughout the

Relevant Time Period.  Through BHI and CHP, the Blues share confidential claims data reflecting

provider reimbursements on a nationwide basis.  Defendants use this data to collectively, and

through concerted action, reduce in their contracts with Plaintiffs and other health care providers

the level of reimbursements below what those levels would be if Defendants were acting

unilaterally instead of collectively.

## VII.    ENFORCING COMPLIANCE WITH THE BLUES' ANTICOMPETITIVE AGREEMENTS

214.    Defendants have developed mechanisms to enforce compliance by their fellow

Blues with their conspiratorial agreements not to compete.

215.    First, the Blues' License Agreements expressly state that BCBSA can impose fines

in the event that a Blue decides to operate outside its ESA: "BCBSA may impose monetary fines

on the Plan for the Plan's use of the Licensed Marks and Names outside the Service Area."

216.    Second, the Blues use BCBSA to impose discipline on a Blue that fails to comply

with the Defendants' conspiracy agreements and other anticompetitive conduct.  If a Blue fails to

comply with the agreements, it faces "Immediate Termination," "Mediation and Arbitration," and

"Sanctions."  The PPFSC has the power to impose such discipline.  Under the Guidelines, after

the PPFSC's "initial determination about a Plan's compliance with the license agreements and

membership standards . . . PPFSC makes a recommendation to the BCBSA Board of Directors,

which may accept, reject, or modify the recommendation."  A Blue's licenses and membership in

BCBSA may be terminated on a three-fourths or greater affirmative Blue and Blue-weighted vote.

And under the License Agreements, "[i]n addition to any and all remedies . . . BCBSA may impose

monetary fines on the Blue for the Blue's use of the Licensed Marks and Names outside the Service Area."

217.    Third, Defendants use the BCBSA Guidelines if necessary to enforce compliance with the scheme.  The Guidelines state that "BCBSA shall send a triennial membership compliance letter to each [member] Plan's CEO," which includes, among other things, "a copy of the Membership Standards and Guidelines, a report of the Plan's licensure and membership status by Standard, and PPFSC comments or concerns, if any, about the Plan's compliance with the License Agreements and Membership Standards."  In response, "[t]he Plan CEO or Corporate Secretary must certify to the PPFSC that the triennial membership compliance letter has been distributed to all Plan Board Members."

218.    If a Blue's trademark license and membership in BCBSA were terminated due to violations of the Defendants' anticompetitive agreements, that Blue would face the threat of catastrophic economic consequences, including losing its right to operate a Blue-branded health insurance plan.

219.    The License Agreements further state that, in the event of a termination, the terminated Blue would be required to pay a fee to the other Blues through BCBSA (the "Re-Establishment Fee").  The Re-Establishment Fee would be used to establish a new Blue in the vacated ESA, essentially forcing a Blue to fund a new, Blue-branded competitor in its existing territory.  In 2024, Defendant Anthem stated that its Re-Establishment Fee was $98.33 per enrollee.  If applied to Anthem's Blue subscribers, the fee would be approximately $3 billion.  The Re-Establishment Fee helps enforce the challenged conduct' agreements by dissuading the Blues from violating their promises not to compete.

220.    Fourth, the IPPC facilitates the anticompetitive standards the Blues must comply with.  The IPPC controls the national or Inter-Plan Programs of the Blues, including the BlueCard Program and the National Accounts Program.  The Blues have collectively agreed to comply with the requirements established by the IPPC.

221.    Fifth, the Blues have developed mechanisms to share reimbursement payment data and other competitively sensitive information in furtherance of their price fixing conspiracy, as described above.  Sharing this information allows the Defendants to confirm that no Blue is "cheating" by offering reimbursement rates above those to which Defendants have agreed.

## VIII.    RULE OF REASON ALLEGATIONS

222.    Defendants' conduct as alleged herein is *per se* unlawful under federal and state antitrust laws.  Nonetheless, if the quick look or rule of reason standard were to apply, Defendants' conduct would still violate federal and state antitrust law.  The following allegations apply to Plaintiffs' claims under the rule of reason.

223.    This case involves a number of markets in which the Blues participate, and which have been affected by the Blues' anticompetitive agreements in furtherance of the challenged conduct.  The Blue Defendants have market power in many markets over reimbursement rates for health care providers.  Even in markets where the Blue Defendants do not have significant market shares, they have market power or have otherwise exploited anticompetitive actions by leveraging their more than 115 million subscribers.

### A.    Relevant Product Markets

224.    The Relevant Product Market is the purchase by commercial insurers of health care and other services, goods and facilities from health care providers, excluding purchases for Medicare Advantage and managed Medicaid.

225.    Commercial insurers are in the business of (i) selling commercial health insurance; (ii) administering commercial health plans for private employers, other groups, or individuals; or (iii) both (as noted above, collectively referred to in this Complaint as "health insurance"). Commercial insurers purchase health care and other services, goods and facilities from health care providers, including Plaintiffs.  Commercial insurers are typically paid a premium by private employers, individuals, or other groups at regular intervals, which generally depends on the terms and coverage of the insureds' plans, that is untethered to the actual amount of health care and other services, goods and facilities received by individuals covered by the insurance plan at any given point in time.

226.    With respect to the Relevant Product Market, the Blues are commercial insurers and would-be competitors who purchase health care and other services, goods and facilities on behalf of the subscribers whom they insure, or for whom they administer self-insured health care benefit plans.  The Blues directly purchase health care and other services, goods and facilities from health care providers, including Plaintiffs, on behalf of their plan subscribers.  The challenged conduct involves agreements among Defendants inhibiting competition among the Blues in the Relevant Product Market.

227.    *The Relevant Product Market is consistent with industry practice and commercial realities*.  Health care providers—including Plaintiffs—engage in two-stage competition: (i) first they compete for inclusion in the provider networks of commercial insurers health' plans, and then (ii) they compete for patients within a given plan.  The Relevant Product Market relates to the first stage of competition.  Plaintiffs must first determine the commercial insurance and government payors with which they will contract.  In Massachusetts, the majority of commercial insurance payments to the Plaintiffs is attributable to the Defendants.  All Plaintiffs regardless of whether

they offer inpatient, outpatient, or other health care and services, goods and facilities, must decide whether to contract with the Blues, with other commercial insurance providers, and/or with government payors.

228.    Commercial insurers separately contract to purchase health care and other services, goods and facilities from health care providers, such as Plaintiffs.  As part of their effort to build a competitive provider network, commercial insurers' contracting teams regularly formulate their own business plans and develop reimbursement strategies specific to health care providers. Commercial insurers, including the Blues, contract with Plaintiffs and other health care providers to establish reimbursement rates for a broad array of health care or other goods and facilities, which are then reflected as "covered" by the insurance plan sold to subscribers of their plans.

229.    The Relevant Product Market is not segmented by the type of health care and other services, goods, or facilities at issue.  The extent to which individual covered services goods, and facilities compete or do not compete with each other or with services, goods and facilities not covered by a particular health plan is not relevant.

230.    Health care and other services, goods and facilities sold to government insurers through government programs, including Medicare Advantage and managed Medicaid, are excluded from the Relevant Product Market.  Plaintiffs and other health care providers' contracting processes for patients covered by government programs, including Medicare Advantage and managed Medicaid, are often separate from the processes used for commercial insurers, including separately negotiated contracts and separate contracting teams.  In addition, reimbursement rates for government programs such as Medicare Advantage and managed Medicaid are very often substantially different from, and lower than, the rates paid by commercial insurers.  Often,

reimbursement rates for commercial insurers are expressed in multiples of rates for government programs, such as Medicare.

231.    *The Relevant Product Market satisfies the hypothetical monopsonist test.*  A profit-maximizing hypothetical monopsonist in the Relevant Product Market likely would reduce amounts paid to Plaintiffs and other health care providers below competitive levels by imposing at least a small but significant and non-transitory reduction in price ("SSNRP").

232.    Plaintiffs and other health care providers earn revenue by treating commercially insured patients (*i.e.*, subscribers of health plans offered by commercial insurers and on whose behalf commercial insurers purchase health care and other services, goods and facilities) and non-commercially insured patients (*i.e.*, patients who pay entirely out-of-pocket and patients covered by government insurance programs).

233.    Plaintiffs and other health care providers cannot feasibly forgo sales to commercial insurers by selling to other buyers.  Plaintiffs and other health care providers often rely on revenue from treating commercially insured patients to subsidize losses from treating non-commercially insured patients, including uninsured patients and patients reimbursed through government programs.  Plaintiffs and other health care providers could not make up for even a small loss in commercial patients by substituting non-commercially insured patients, including uninsured patients and government patients, because Plaintiffs and other health care providers make little to no money (and often lose money) treating non-commercially insured patients.  Often, uninsured patients cannot pay out-of-pocket costs for their treatment, and, in any event, there are very few such patients compared to commercially insured patients.  Plaintiffs and other health care providers could not remain operational in the absence of commercially insured patients.  The Blue Defendants recognize these commercial realities—for example, Defendant Anthem's CEO

testified during the DOJ's Anthem/Cigna merger trial that these are "the rules of engagement in the industry."

234.    For Plaintiffs and other health care providers, the substitutability between commercial insurers and other payors (uninsured patients paying out-of-pocket and government insurers) of health care and other services, goods and facilities is low, as reflected in measures such as a low cross elasticity of supply.

235.    *Alternative Relevant Product Submarkets*.  In the alternative, three submarkets exist within the Relevant Product Market (the "Relevant Product Submarkets").  These Relevant Product Submarkets are:

a.    The purchase by commercial insurers of goods, services, and facilities from health care professionals;

b.    The purchase by commercial insurers of goods, services, and facilities from health care facilities; and

c.    The purchase by commercial insurers of durable medical equipment ("DME") by residents in states and regions in which Plaintiffs operate.

236.    Like the Relevant Product Market, each of the Relevant Product Submarkets excludes the purchases for Medicare Advantage and managed Medicaid.

237.    Several factors support the existence of these alternative Relevant Product Submarkets.  The health care industry frequently adopts the distinctions among health care professional services, health care facility services, and DME.  Commercial insurers, including the Blues, typically negotiate different reimbursement methodologies for each Relevant Product Submarket.  Commercial insurers' contracting teams and processes often differ among these alternative Relevant Product Submarkets.  Plaintiffs and other providers of health care facility

services face the same options for the purchase of their goods, services, and facilities described above.  As a result, in each alternative Relevant Product Submarket, the substitution between commercial insurers and other payors is low, as reflected in measures such as a low cross elasticity of demand.  A profit-maximizing hypothetical monopsonist in these alternative Relevant Product Submarkets would likely reduce amounts paid to Plaintiffs and other health care providers below competitive levels by imposing at least a SSNRP.

     **B.**     **<u>Relevant Geographic Markets</u>**

238.    For the Relevant Product Market and the alternative Relevant Product Submarkets (other than for alternative Relevant Product Submarket for DME), the Relevant Geographic Market is BCBS-MA's ESA, in which Plaintiffs continuously have operated during the Relevant Time Period.  For DME, the Relevant Geographic Market is nationwide because DME can be shipped across state lines.

239.    But for the Conspiracy, each Blue would compete or would potentially compete in the Relevant Geographic Market.

240.    Plaintiffs have built their patient base and have invested substantial amounts in physical assets to treat patients located in its Relevant Geographic Market.

241.    <u>*The Relevant Geographic Market satisfies the hypothetical monopsonist test*</u>. Plaintiffs cannot respond to a SSNRP by moving their services, goods, and facilities out of the Relevant Geographic Market.  Therefore, a profit-maximizing hypothetical monopsonist in the Relevant Product Markets or alternative Relevant Product Submarkets in the Relevant Geographic Markets would likely reduce amounts paid to Plaintiffs and other providers below competitive levels by imposing at least a SSNRP.

C.    **Defendant Blues' Market Power**

242.    The Defendant Blues have market power in the Relevant Markets and alternative Submarkets described above.  BCBS-MA operating in its ESA obtains large numbers of members without competition from other Blues, and uses those increased membership numbers in negotiations with Plaintiffs to reduce reimbursement rates.  In turn, the BlueCard program allows BCBS-MA to exercise market power on behalf of all the Defendants by reducing reimbursement rates paid to Plaintiffs.  An internal BCBSA Assembly of Plans report states that ESAs create "[l]arger market share because other Blues stay out and do not fragment the market. . . . [ESAs create] stronger provider agreements for the same reason."

243.    The challenged conduct has caused Plaintiffs to be under-reimbursed over the years by billions of dollars.  Additional data obtained through discovery will enable Plaintiffs to identify the full extent of Plaintiffs' monetary and other harm caused by the challenged conduct.

244.    The fact that Plaintiffs have suffered harm is further confirmed by Defendants' own statements.  Since the early 1980s, Defendants have expressly referenced their efforts to maintain and increase their "differentials," a term Defendants use to refer to their unlawfully obtained reimbursement rate advantage over their competitors.

245.    With respect to their "differentials," an increase in one Blue's differential wrongfully benefits the entire Blue system.  In recognition of this basic fact, the  CEO of BCBSA stated in a letter to the CEOs of the Blues during the Relevant Time Period:  "Every 1% increase in the differential in the priority Plans results in a system-wide increase of 12%.  The psychological impact for the other Plans as well as hospitals for breakthrough in these major states would be extremely important.  In addition, there would be significant dollar impact in each Plan."

246.    Defendants also identified and took action to stop threats to their differentials.  In an effort during the Relevant Time Period known as "Project State Watch," Defendants calculated

how much the overall differential for the entire Blue system might be reduced if a given state differential was reduced.

247.    Defendants have conspired to suppress the amounts paid to Plaintiffs in an effort to protect and increase their differentials.  Defendants have further used the CHP entity to identify and develop "action plans" for "critical markets" to further BCBSA's corporate objective of reducing reimbursements and increasing discounts obtained from Plaintiffs as well as from other health care providers.

248.    The differentials enabled by the challenged conduct were not mere cost savings passed on to the Blues' subscribers.  Rather, Defendants have used these differentials to unlawfully obtain significantly higher profits and build even higher surpluses for each of the Blues, and to provide excessive compensation to the Blues' high-level executives responsible for orchestrating the challenged conduct.

249.    The express, concerted conduct by Defendants to coordinate their efforts to lower reimbursement rates paid to Plaintiffs is further evidence that the challenged conduct has caused damage to Plaintiffs.

250.    The nature of the agreements that constitute the challenged conduct increases the Blues' market power.  The Blues have agreed not to enter each other's ESAs, have instituted "Best Efforts" rules strictly limiting their ability to generate revenue from competing non-Blue health plans, and have agreed to fix reimbursement rates for Blue subscribers treated by health care providers outside of their ESAs.  As a consequence, BCBS-MA negotiates with Plaintiffs under unlawfully reduced competition.

251.    Given their size and efforts to expand through mergers and acquisitions, multiple Blues would have entered or attempted to enter other ESAs but for their anticompetitive and unlawful agreements to refrain from doing that.  As but a few examples:

1.    Defendant Anthem operates as a Blue Cross/Blue Shield licensee for 14 states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin.  Anthem has shown a clear intent to expand its operations.  If it had not entered into the anticompetitive agreements that constitute the challenged conduct, Anthem would very likely have expanded its operations on a near-nationwide basis.

2.    Defendant HCSC operates as a Blue in Illinois, Montana, New Mexico, Oklahoma, and Texas.  It is the largest mutual health insurance company in the country and the fourth largest health insurance company overall.  Similar to Anthem, HCSC would very likely purchase health care and other services, goods and facilities throughout the United States in direct competition with the other Blues, but HCSC has not done so because of its participation in the challenged conduct.

3.    Defendant Highmark is also one of the largest health insurers in the country by market share.  Its affiliated Blues operate in Delaware, New York, Pennsylvania, and West Virginia.  Given its size, Highmark very likely would have expanded to other ESAs but for its participation in the challenged conduct.

4.    Defendant BCBS-MI operates in Michigan and Vermont and is the ninth largest health insurer in the country by total medical enrollment.  BCBS-MI operates in other states on a limited basis through a Medicare subsidiary.  Given its size, BCBS-

MI very likely would have expanded to other ESAs but for its participation in the challenged conduct.

252.    Defendants Cambia, CareFirst, GuideWell, Premera, and Wellmark each currently operate as a Blue in multiple ESAs.  Given their demonstrated ability to do so, it is reasonable that they would be able to operate in other ESAs, absent the challenged conduct.

### D.    **Defendant Blues' Market Power in the Relevant Markets**

253.    When commercial insurers purchase health care and other services, goods and facilities from Plaintiffs and other health care providers, the vast majority of the time they do so pursuant to a fee-for-service contracting model, in which the amount they pay is based on the amount of health care and other services, goods and facilities provided to their commercially-insured patients.  Accordingly, commercial realities dictate that the greater the number of subscribers on whose behalf a commercial insurer purchases health care and other services, goods and facilities, the greater the overall amount of health care and other services, goods and facilities the commercial insurer will purchase from Plaintiffs and other health care providers, and the greater the commercial insurer's bargaining leverage to negotiate more favorable contractual terms, including reimbursement rates, with Plaintiffs and other health care providers.

254.    A commercial insurer's total enrollment (that is, a commercial insurer's total number of subscribers) is thus a relevant and reliable measure of that insurer's competitive significance, and that insurer's market power, in the Relevant Markets or alternative Submarkets. This is because a commercial insurer with greater enrollment in the Relevant Markets or alternative Submarkets will typically account for a greater amount of a health care provider's patient volume and revenue.

255.    Also, in Plaintiffs' experience and consistent with commercial realities, a commercial insurer's enrollment share (that is, the proportion of that insurer's subscribers

compared to all commercial insurers' subscribers) is a highly relevant and reliable measure for that insurer's competitive significance and market power, in the Relevant Market or alternative Submarkets. This is because a commercial insurer with greater enrollment share in the Relevant Markets or alternative Submarkets will typically account for a greater share of a health care provider's patient volume and revenue. Here, this means that the Blue Defendants have market power in Relevant Markets or alternative Submarkets with high numbers of subscribers.

256.    To evaluate an individual Blue Defendant's market power, it is appropriate to include the total enrollment and enrollment share of all Blues together within the Relevant Markets or alternative Submarkets. When BCBS-MA is contracting with Plaintiffs, its enrollment share includes its own subscribers and those subscribers for whom Plaintiffs are compensated pursuant to the Blues' agreements made pursuant to Inter-Plan Programs, including the BlueCard Program and National Accounts Program.

257.    The Blue Defendants recognize and make use of these commercial realities to their advantage. For example, an internal BCBSA Assembly of Plans report states that the Blues' ESAs create "[l]arger market share because other Blues stay out and do not fragment the market. . . . [this enables] stronger provider agreements for the same reason."

258.    Therefore, when Boston Children's Hospital negotiates with BCBS-MA, BCBS-MA has the market power behind it of all the Defendants, which amounts to far greater market power than any health insurer in the entire country.

259.    But for the challenged conduct, one or more Blue Defendants would have been permitted to enter, or would have in fact entered, BCBS-MA's ESA and competed with them. This entry or potential entry would have reduced the market power of BCBS-MA, resulting in higher reimbursement rates paid to Plaintiffs.

260.    There are also significant barriers to entry for a commercial insurer to enter the Relevant Markets and alternative Submarkets.  The barriers to entry include, among others, (i) establishing a provider network, (ii) establishing a subscriber base, and (iii) complying with state regulatory requirements.  These barriers to entry are particularly detrimental to the entry of new competitors where the challenged conduct has allowed, as here, an incumbent Blue to achieve substantial market power.  In particular, a non-incumbent Blue may face fewer barriers to entry into a new ESA at least because the non-incumbent Blue may have a significant number of subscribers within that ESA through the BlueCard Program and/or National Accounts Program.

261.    The Blue Defendants have taken other unlawful actions to protect their ill-gotten market power.  For example, the Blue Defendants also structure and implement out-of-network benefits for subscribers to discourage subscribers from using those out-of-network benefits.  Some Blue Plans also eliminate or cap out-of-network benefits.  The Blues have retaliated or threatened retaliation against health care providers who attempt to operate outside of a Blue network.  In a competitive market, the Blue Defendants would lack the market power to engage in such strategies, and increased competition between and among them would result in higher quality care.

262.    Although they are independent entities that should be in heated competition with one another, the individual Blue Defendants use their ability to steer patients through the BlueCard and National Accounts Programs as a means to exercise market power.

### E.    Defendants' Anticompetitive Conduct

263.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

264.    Defendants' anticompetitive conduct is an unreasonable and undue restraint on trade.  The following anticompetitive acts by Defendants violate the antitrust laws both independently and collectively:

a.    Defendants have created the ESAs, which are facially anticompetitive because they both protect each Blue from other Blues entering, or potentially entering, their ESA (amounting to a protective fence) and prohibit each Blue from entering, or potentially entering, any other Blue's ESA (amounting to a restrictive cage).

b.    Defendants have collectively implemented the BlueCard and National Accounts Programs. Pursuant to these programs, BCBS-MA has gained additional power within its conspiracy-created ESA.  These programs have also significantly increased Plaintiffs' administrative costs, claim denials, underpayments, and payment delays, and dissuaded non-local Blues from negotiating contracts with Plaintiffs even if doing so would otherwise make economic and practical sense.

c.    The Blues' agreements as to Local Best Efforts and National Best Efforts rules are anticompetitive because they limit the amount of non-Blue business each Blue may conduct.

d.    The Blue Defendants share Plaintiffs' competitively-sensitive contract information among themselves either directly or through third parties created or controlled by the Blues.

265.    As alleged above, Defendants have created processes to monitor and impose draconian consequences on any Blue Defendant that attempts to act outside of the anticompetitive agreements.

266.    But for the anticompetitive conduct described above, the Blues would compete with each other in Massachusetts.  This would result in one or more additional Blue operating in BCBS-MA's ESA and would hinder BCBS-MA's ability to exploit its market power.

267.    The Blues' anticompetitive conduct has no procompetitive benefits or, if there could be any procompetitive benefits from some aspect of Defendants' conduct, those benefits are far outweighed by the anticompetitive effects of the conduct.  More specifically:

a.    Defendants have not created or adopted new products or services that would otherwise exist absent their anticompetitive conduct, including contracting arrangements intended to lower the total cost of delivering health care.

b.    The formation of ESAs is not necessary to protect any common law trademark rights that might exist.  BCBSA has acknowledged that overlapping service areas do not cause consumer confusion.  In the limited areas where multiple Blues have competed at times (*e.g.*, California, Idaho, New York, Pennsylvania, and Washington), there is also no evidence of customer confusion.

c.    The Blues would be able to compete with other commercial health care insurers under Blue or non-Blue brands on a local, state, and/or nationwide basis without the anticompetitive agreements.

d.    Defendants' anticompetitive conduct has not increased efficiencies for individual Blues, as the reduced competition has suppressed innovation by the Blues and Defendants' anticompetitive agreements are not necessary for individual Blues to determine whether to remain focused on a single geographic area or to expand.

268.    The BlueCard and National Accounts Programs also increase inefficiencies and reduce patient welfare.  Any purported procompetitive effects of the national programs are outweighed by the anticompetitive effects that they create.  Other health insurers and managed care companies have been able to offer nationwide networks of health care coverage without anticompetitive agreements.

## IX.    <u>BCBS-MA HAS  PROFITED FROM THE UNFAIR COMPETITION</u>

269.    BCBS-MA abides by BCBSA's rules and regulations, including the Blue Cross License Agreement and the Blue Shield License Agreement, the Membership Standards Applicable to Regular Members, and the Guidelines to Administer Membership Standards.

270.    BCBS-MA participates in the governance structure of BCBSA by and through its officers voting on and approving the bylaws of the Association.

271.    Throughout the Relevant Time Period, BCBS-MA's CEO has sat on BCBSA's Board of Directors.  As such, BCBS-MA's CEO has participated and continues to participate in electing its President and has a fiduciary responsibility to BCBSA.

272.    BCBS-MA's executives contribute to the governance of BCBSA through participating in its various committees, such as the PPFSC and IPPC.  BCBS-MA complies with the terms and standards of these committees.

273.    BCBS-MA shares confidential and competitively sensitive information, including data on reimbursement rates paid to Plaintiffs, with BCBSA and the other Defendants.

274.    BCBS-MA participates in the Federal Employee Health Benefits Program ("FEBHP") along with other Defendants.  This includes the Federal Employee Program ("FEP") which provides healthcare coverage to more than 5 million federal employees.  As such, BCBS-MA executes a contract with BCBSA which obligates it to underwrite the FEP benefits to federal employees throughout the Commonwealth of Massachusetts.  When Plaintiffs treat the children of federal employees subscribed to this program, they are reimbursed at uncompetitive rates.

275.    Throughout the relevant period, BCBS-MA has complied with BCBSA's Local and National Best Efforts Rules.

276.    In accordance with these national rules, BCBS-MA has refused to develop a robust provider network that could compete in the health insurance market under its non-Blue-branded affiliates.

277.    In line with the BCBSA's illegal output limitations, BCBS-MA has chosen to primarily sell ancillary insurance (*i.e.*, insurance which does not directly compete with BCBS-MA or other Defendants) under its affiliated brands.  For instance, its affiliated Indigo brand focuses on selling ancillary insurance like Group Term Life, Group Travel, and Pet Insurance.

278.    BCBS-MA has adhered to BCBSA's National Accounts Program and the BlueCard programs.

279.    As a result of the Market Allocation, Group Boycott, and Price fixing conspiracy, BCBS-MA, despite its status as a non-profit corporation, has amassed substantial profits (in the form of excessive capital reserves).

280.    BCBS-MA's financial records for the most recent years available demonstrate substantial capital reserves and the ability to pay handsome amounts of compensation to its executives and board members.

281.    BCBS-MA's financial status belies the notion that BCBS-MA's depressed reimbursement rates are necessary to cover its  yearly expenses.

282.    In fact, BCBS-MA's capital reserves are well above and beyond what is needed to successfully operate as a non-profit health insurer.

## X.    THE CHALLENGED CONDUCT HAS CAUSED PLAINTIFFS' ANTITRUST INJURIES

283.    Defendants' anticompetitive conduct has caused antitrust injury and harm to competition.

284.    Defendants' anticompetitive conduct has caused antitrust injury to Plaintiffs in the form of lower reimbursement rates and the imposition of other unfair contracting terms in respect of each of the anticompetitive agreements and enforcement mechanisms described above that make up the challenged conduct.

285.    The Market Allocation Scheme, Boycott Conspiracy and Price Fixing and other agreements made in furtherance of them comprise an aggregation of anticompetitive horizontal restraints that artificially decrease reimbursements to Plaintiffs, reduce output of health care and other services, goods and facilities, and increase costs to patients, the Blues' own subscribers.

286.    The Market Allocation Scheme, Boycott Conspiracy and Price Fixing includes a set of agreements creating ESAs and output restrictions.  These agreements cause antitrust injury to Plaintiffs.  The Defendants have agreed that the Blues will not compete across ESAs by restricting each Blue from selling insurance and from negotiating and contracting with Plaintiffs outside of a designated geographic ESA.  By allocating the markets in which the Blues may operate, Defendants have restrained competition in the Relevant Markets or alternative Relevant Submarkets.  The number of commercial insurers and Blue-branded and non-Blue branded health insurance plans has been reduced, lowering the level of competition among commercial health insurers for the reimbursement rates offered and paid to Plaintiffs.  The Blue Defendants have agreed among themselves to jointly impose unlawful output restrictions, including the so-called National Best Efforts and Local Best Efforts rules, by functionally restricting the Blues' ability to operate under non-Blue brands within and across their ESAs, which has also caused antitrust injury to Plaintiffs.  By agreeing that each Blue would limit its revenue from non-Blue branded business in their ESAs, Defendants have directly reduced the amount of competition among the Blues and other commercial insurers in the Relevant Markets or alternative Relevant Submarkets.  Absent

these output restrictions, the Blues would have conducted more health insurance business apart from and in competition with their Blue-branded insurance business.

287.    In light of each Blue's monopsony power in its Relevant ESA as a result of the Market Allocation Scheme, Plaintiffs have been faced with artificially suppressed rates provided by BCBS-MA during contract renewal periods.  In these instances, BCBS-MA has provided no alternative to the rates the Defendants dictate other than termination or expiration of the parties' agreement, which is not financially feasible for Plaintiffs.

288.    Absent the Market Allocation Scheme, there would be more competition among commercial insurers for the reimbursement of health care and other services, goods and facilities purchased from Plaintiffs.  This competition would increase the reimbursement rates available to Plaintiffs.  There also would be more competition for the business of selling commercial health insurance or administering commercial health plans for private employers, other groups, or individuals.

289.    The agreements comprising the challenged conduct inhibit inter-brand competition by, among other things, promoting local dominance and creating barriers to entry by non-Blue brands and hindering the Blues' own ability to compete with other brands.

290.    Defendants' conduct has caused increased market concentration and reduced competition in the Blues' ESAs throughout the United States, with the effect being lower reimbursement rates paid to Plaintiffs than what Plaintiffs would have received if competition were not restricted by Defendants' anticompetitive agreements and the Blues' ability to impose one-sided contracting terms causing "payment friction" that results in delayed and reduced reimbursements to Plaintiffs.  Plaintiffs are paid for in-network patients pursuant to contracts with BCBS-MA primarily under a fee-for-service model in which the amount of Plaintiffs'

reimbursements are based on the overall amount of health care and other services, goods and facilities provided to patient-subscribers. Plaintiffs are forced to accept lower reimbursement rates because there is only one Blue in the area in which Plaintiffs operate. Due to the lack of competition attributable to the challenged conduct, the reimbursement rates offered by Defendants are set at artificially suppressed levels.

291. Because of the Blues' collective market power with over 115 million total subscribers, Plaintiffs wishing to join or remain in a Blue network must use the BlueCard Program and accept lower reimbursement rates than they would receive if permitted to contract directly with other, non-local Blues.

292. Plaintiffs have also been harmed because the challenged conduct restricts their choices. Plaintiffs are not offered the opportunity to contract directly with any Blue other than their local Blue.

293. The challenged conduct has existed and has been continuously ongoing at least since 2008, and continues through the present. Although the Defendants purported to formally terminate the so-called National Best Efforts rule in 2021 in connection with the settlement of antitrust litigation brought by their subscribers, the economic effects of that output restriction, and related harm to Plaintiffs, have been carrying on and will continue to carry on for many years. Moreover, all the other challenged anticompetitive conduct detailed herein has continued unabated.

## XI.    THE CHALLENGED CONDUCT SHOULD BE ENJOINED

294. The challenged conduct is an aggregation of anticompetitive horizontal restraints that are mutually reinforcing and work together synergistically to artificially decrease reimbursements to Plaintiffs, reduce output of health care and other services, goods and facilities, and increase costs to patients, including the Blues' own subscribers. The challenged conduct, and

their component agreements, viewed separately or together, are unlawful under the *per se*, quick look, and/or rule of reason standards and should be enjoined to prevent further harm to competition. The challenged conduct lacks procompetitive justifications and, viewed separately or together, amounts to naked restraints of trade.

295. The agreements comprising the Blues' Price Fixing and Boycott Conspiracy prevent or reduce competition among the Blues to sell insurance and contract with health care providers such as Plaintiffs. They prevent Blues from establishing more efficient and innovative contracts with health care providers, which would improve health care quality and lower health care costs for health care providers and patients. They have harmed competition to sell insurance and competition for contracts with health care providers such as Plaintiffs. In particular, Plaintiffs should be allowed to opt out of the BlueCard System, with no threat of retaliation, and negotiate at arm's length with Blues other than their local Blue. To the extent that Plaintiffs wish to remain in the BlueCard Program, they should be permitted to do so subject to the structural changes Defendants agreed to implement in connection with their pending settlement of the provider class action litigation before the MDL in the Northern District of Alabama.

296. The anticompetitive conduct of the Defendants over a significant period of time will require meaningful injunctive relief. Even with that relief, the conduct and market conditions created by the Defendants will not be remedied overnight. The Court will need to impose reporting and judicial oversight for a significant period of time to ensure that the remedies are adequate and effective.

297. For the avoidance of doubt, Plaintiffs seek injunctive relief only on their own behalf, and do not seek injunctive relief that would alter or interfere with the injunctive relief in the provider class settlement in the MDL Litigation.

## XII.   PLAINTIFFS' DAMAGES FROM THE CHALLENGED CONDUCT

298.   Plaintiffs have been and continue to be damaged by the challenged conduct. Plaintiffs' damages include, but are not limited to, having received (and continuing to receive) artificially lower reimbursement rates and contractual terms less favorable than Plaintiffs would have obtained but for Defendants' anticompetitive conduct.

299.   The challenged conduct has caused Plaintiffs to be collectively under-reimbursed by billions of dollars during the Relevant Time Period.  Additional data obtained through discovery will enable Plaintiffs to identify the full extent of Plaintiffs' damages caused by the challenged conduct.

## CAUSES OF ACTION

### First Cause of Action

### Violation of 15 U.S.C. § 1 – Market Allocation Scheme

300.   Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

301.   As alleged above, Defendants have entered into horizontal agreements to divide markets, reduce output, and unreasonably restrain competition in the Relevant Markets or alternative Relevant Submarkets.  Defendants' agreements constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

302.   The court in the MDL Litigation has entered orders concluding that the Market Allocation Scheme is subject to the *per se* standard of review and such rulings should apply here.

303.   In the alternative, Defendants' agreements to divide markets, reduce output, and unreasonably restrain competition in the Relevant Market and alternative Relevant Submarkets violate Section 1 of the Sherman Act under the "quick look" analysis because the agreements have an effect on markets and market participants that an observer with even a rudimentary

understanding of economics would conclude are anticompetitive. Defendants' agreements have no pro-competitive effects. The agreements are not related to or necessary for any trademark protection. Nor have Defendants' agreements resulted in the establishment of any new product or innovation. No inquiry into market power is required to determine that Defendants violated Section 1 of the Sherman Act.

304. In the alternative, Defendants' agreements to divide markets, reduce output, and unreasonably restrain competition in the Relevant Market and alternative Relevant Submarkets violate Section 1 of the Sherman Act under a "rule of reason" analysis. Defendants' agreements have no pro-competitive effects. The agreements are not related to or necessary for any trademark protection. Nor have Defendants agreements resulted in the establishment of any new product or innovation.

305. Defendants' historical and continuing violations of Section 1 of the Sherman Act have and continue to directly and proximately cause harm to competition in a manner that the federal antitrust laws were designed to prevent. Plaintiffs' damages flow directly from the Defendants' agreements made in violation of Section 1 of the Sherman Act.

306. Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' violations of Section 1 of the Sherman Act. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiffs are entitled to recover threefold damages, interest, and the costs of suit, including reasonable attorneys' fees.

307. Plaintiffs are also entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Defendants' violations of Section 1 of the Sherman Act are causing ongoing harm

to Plaintiffs.  Plaintiffs are entitled to permanent injunctive relief and other remedies, including monitoring and reporting requirements.

<u>**Second Cause of Action**</u>

**Violation of 15 U.S.C. § 1 – Price Fixing and Boycott Conspiracy**

308.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

309.    As alleged above, Defendants have entered into horizontal agreements to fix prices, boycott, reduce output, and otherwise unreasonably restrain competition in the Relevant Market and alternative Relevant Submarkets.  Defendants' agreements constitute *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

310.    In the alternative, Defendants' agreements to fix prices, boycott, reduce output, and unreasonably restrain competition in the Relevant Market and alternative Relevant Submarkets also constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "quick look" analysis because the agreements have an effect on markets and market participants that an observer with even a rudimentary understanding of economics would conclude is anticompetitive. Defendants' agreements have no pro-competitive effects.  Nor have the agreements resulted in the establishment of any new product or innovation.  No inquiry into market power is required to determine that Defendants violated Section 1 of the Sherman Act.

311.    In the alternative, Defendants' agreements to fix prices, reduce output, boycott, and unreasonably restrain competition in the Relevant Market and alternative Relevant Submarkets also constitute violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, under a "rule of reason" analysis.  Defendants' agreements have no pro-competitive effects.  Nor have the agreements resulted in the establishment of any new product or innovation.

312.    Defendants' historical and continuing violations of Section 1 of the Sherman Act have and continue to directly and proximately cause harm to competition in a manner that the federal antitrust laws were designed to prevent and damaged Plaintiffs.  Plaintiffs' damages flow directly from the agreements made in violation of Section 1 of the Sherman Act.

313.    Plaintiffs' damages include receiving payments at lower rates, less favorable contract terms, and less total revenue than Plaintiffs would have received but for Defendants' violations of Section 1 of the Sherman Act.  Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiffs are entitled to recover threefold damages, interest, and the costs of suit, including reasonable attorneys' fees.

314.    Plaintiffs are also entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.  Defendants' violations of Section 1 of the Sherman Act are causing ongoing harm to Plaintiffs.  Plaintiffs are entitled to permanent injunctive relief and other remedies, including monitoring and reporting requirements.

### Third Cause of Action

### Violation of M.G.L. C. 93A, § 11

### (BCBS-MA)

315.    Plaintiffs incorporate the allegations set forth in the foregoing paragraphs as though set forth herein.

316.    At all times relevant to this action, Defendants have been engaged in trade or commerce within the Commonwealth of Massachusetts within the meaning of M.G.L. C. 93A, § 11.

317.    By its acts and conduct, BCBS-MA has engaged in anticompetitive agreements with the other Defendants that have been unfair and deceptive, to its advantage and Plaintiffs' material harm.

318.    BCBS-MA has engaged in this unfair and deceptive conduct primarily and substantially within the Commonwealth of Massachusetts. For instance, BCBS-MA (1) negotiates subcompetitive reimbursement rates with providers like Boston Children's Hospital and its affiliates, (2) solicits (absent meaningful Blue-on-Blue competition) large national accounts headquartered in Massachusetts, (3) limits the output of its affiliate brands, such as Indigo, who could otherwise compete for providers like Boston Children's Hospital, (4) underwrites the BCBSA-negotiated FEP plan for federal employees at depressed provider rates, and (5) otherwise complies with, and effectuates, the various aspects of Defendants' nationwide Market Allocation and Price Fixing and Boycott Conspiracies. This is an unexhaustive snapshot of some of BCBS-MA's unfair and deceptive conduct that occurs primarily and substantially in the Commonwealth.

319.    The "center of gravity" of Boston Children's Hospital claims as to Defendant BCBS-MA is squarely in the Commonwealth of Massachusetts.

320.    BCBS-MA has undertaken its unfair and deceptive acts as alleged herein knowingly and willfully, and is therefore subject to a judgment of treble damages and attorneys' fees.

## REQUEST FOR RELIEF

Plaintiffs request that this Court provide the following relief:

a.    Enter judgment that Defendants have each violated Section 1 of the Sherman Act and the state antitrust laws identified herein;

b.    Permanently enjoin each Defendant from all conduct that constitutes violations of Section 1 of the Sherman Act and the state antitrust laws identified herein, including Defendants' agreements and conduct comprising and in furtherance of the challenged conduct, such as entering into or continuing agreements that unlawfully restrict geographic competition, reduce output, fix prices, or otherwise harm

competition for the purchase of health care and other services, goods and facilities, enforcing MFN provisions, or enforcing restrictions on assignments of benefits and directions of payment;

c.    Permanently enjoin Defendants from retaliating against any Plaintiff for participation in this action or the enforcement of any remedy or judgment;

d.    Enjoin Defendants in the same manner and to the same extent Defendants have stipulated to being enjoined in any other action with respect to the conduct alleged herein;

e.    Impose on all Defendants on-going periodic reporting on compliance obligations, including monitoring by the Court or a Court-appointed special master;

f.    Permanently enjoin Defendants from entering into, or from honoring or enforcing, any agreements that restrict the territories or geographic areas in which any BCBSA member may compete;

g.    Permanently enjoin Defendants from continuing with the Market Allocation Conspiracy and to remedy all effects or vestiges of that Conspiracy;

h.    Permanently enjoin Defendants from utilizing the challenged national programs including the Blue Card Program, and the National Accounts Program, to pay healthcare providers and from developing any other program or structure that is intended to or has the effect of fixing prices paid to healthcare providers;

i.    In particular with respect to the Blue Card Program request the following permanent injunctive relief be ordered by Court:

    i.    The Defendants are enjoined from refusing to contract with Plaintiffs even though those Plaintiffs are outside of the Defendants' service areas or

adjacent counties thereto. Plaintiffs may request contract negotiations with any Blue Plan with members residing in Massachusetts, and the Blue Plan shall have a good faith obligation to negotiate with the Provider.

ii.  Defendants may continue to operate the BlueCard Program. However, each Plaintiff shall have the right to opt-out of the Blue Card Program with respect to any Blue entity. The opt-out right will be on a Blue by Blue basis so that a Provider will have the right to opt-out with respect to one Blue Plan but remain in the BlueCard Program for another Blue Plan. The opt-out right shall be exercised on a year by year basis.

iii.  The failure of a Provider to negotiate in good faith with a Defendant will be a defense to any compliance dispute brought by a Provider under the terms of this injunction.

iv.  Defendants' may use non-Blue rental networks to supplement their networks, and any prohibition against the use of such a rental network is enjoined.

j.  Permanently enjoin Defendants from continuing with the Price Fixing and Boycott Conspiracy and to remedy all effects or vestiges of that Conspiracy;

k.   Require on-going periodic reporting on compliance by the Defendants, monitoring by a Special Master and the Court, and a process through which Plaintiffs will be represented in any compliance issue at Defendants' cost, all of which should continue until Defendants show that they have corrected the effects of their illegal conduct;

l.      Disgorgement of Defendants' unlawfully obtained profits obtained pursuant to Defendants' anticompetitive conduct;

m.      Award Plaintiffs damages in the form of three times the amount of damages suffered by Plaintiffs as proven at trial;

n.      Award costs and reasonable attorneys' fees to Plaintiffs as provided by statute, contract or court rule;

o.      Award pre- and post-judgment interest;

p.      For a trial by jury; and

q.      Award any such other and further relief as may be just and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

Dated: June 16, 2025              QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:/s/ *Harvey J. Wolkoff*

Harvey J. Wolkoff (BBO# 532880)
Aliki Sofis (BBO# 675777)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Avenue, Suite 520
Boston, MA 02199-3600
Tel.: (617) 712-7100
harveywolkoff@quinnemanuel.com
alikisofis@quinnemanuel.com

Adam B. Wolfson (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
865 S. Figueroa St., 10th Fl.
Los Angeles, CA 90017
Tel.: (213) 443-3000
adamwolfson@quinnemanuel.com

David LeRay (*pro hac vice forthcoming*)
Samuel I. Waranch (*pro hac vice forthcoming*)
Vinay S. Basti (*pro hac vice forthcoming*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
295 Fifth Ave., 9th Fl.
New York, NY 10016
Tel.: (212) 849 7100
davidleray@quinnemanuel.com
samuelwaranch@quinnemanuel.com
vinaybasti@quinnemanuel.com

*Attorneys for Plaintiffs*